IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 95-10380

---

ELLEN GAIL BENNETT

Plaintiff-Appellee,

versus

PRESLEY PIPPIN JR., Individually and as
Sheriff of Archer County, in his official
capacity (as Sheriff of Archer County, in his
official capacity deleted as per Order dated
11/16/92 - leaving Presley Pippin, Jr.
Individually as dft) (Presley Pippin, Jr., as
Sheriff of Archer County, in his official
capacity, reinstates as per oral order of
Judge Joe Kendall during non-jury trial
2/10/95)

Defendant-Appellant,

and

ARCHER COUNTY TEXAS,

Movant-Appellant.

---

Appeal from the United States District Court
for the Northern District of Texas

---

January 24, 1996

Before REAVLEY, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

In this case, a Texas sheriff and a county appeal a judgment awarding damages to a murder suspect that the sheriff raped. We affirm the award against the sheriff individually, reverse the judgment against the county, and remand for a new trial.

1

I

We describe the pre-trial proceeding in some detail, given the unusual procedural posture that this case has reached. In a complaint filed in June of 1992, Ellen Bennett sued Presley Pippin in the Western District of Texas under 42 U.S.C. § 1983 and Texas common law and demanded trial by jury. The complaint named Pippin in his individual capacity and in his official capacity as Sheriff of Archer County, Texas. It alleged that the Sheriff raped Bennett in the course of a homicide investigation. It further alleged that the Sheriff was "the final policy maker for the county for matters of law enforcement" and that the Sheriff's acts were "the official policy and/or custom of Archer County, Texas."

Three weeks later, attorney William W. Krueger, III, of the law firm of Ludlum & Ludlum, filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) on behalf of the Sheriff individually and in his official capacity. A colloquy between defense counsel and the court at the eventual trial established that the Sheriff and Archer County had agreed initially that Krueger would represent them both at least through the filing of motions and that any conflict of interest in that joint representation would be waived.

The case was transferred to the Northern District of Texas and initially assigned to Judge Belew. Judge Belew denied all motions except the motion to dismiss with regard to the Sheriff in his official capacity. Referring to this court's heightened pleading standard for claims under section 1983, Judge Belew held that the complaint failed to state facts sufficient to allow a court to find

2

that the Sheriff's alleged rape was pursuant to a policy or custom of Archer County as required by <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658, 694 (1978). Judge Belew reasoned that a single, isolated incident could not constitute a policy under <u>Monell</u>.

Shortly after discovery began with problems of insurance coverage in the background, Krueger and Ludlum & Ludlum withdrew as the attorney for the Sheriff and the Sheriff's personal attorney appeared for him. After various continuances and further discovery, Judge Belew granted leave to James Ludlum, also of Ludlum & Ludlum, to replace the Sheriff's personal counsel. Ludlum then moved to reopen discovery on behalf of "Presley Pippin, Jr., Individually and as Sheriff of Archer County, Texas, in his Official Capacity." As we will explain, however, Archer County was not at this time a party and no one thought that they were.

Five days before trial was to have begun, the court entered an order, agreed to by the parties, that the case proceed to arbitration under 28 U.S.C. §§ 651-58. The order stated that the parties waived their rights to a jury trial if either requested a trial de novo under 28 U.S.C. § 655. The arbitration panel returned an award against "Defendant, PRESLEY L. PIPPIN, JR." Pippin requested a trial de novo under section 655. There was no mention of Archer County. By this time, a portion of Judge Belew's docket had been assigned to Judge Kendall, who set for trial on Friday, February 10, 1995.

On the morning of February 10, Judge Kendall began the

3

proceedings by announcing his inclination to reconsider the 12(b)(6) dismissal of Archer County.  Judge Kendall stated that Judge Belew's dismissal had been based upon this circuit's heightened pleading standard for section 1983 cases, and that the Supreme Court had held that standard could not be applied to a claim against a county Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 113 S. Ct. 1160 (1993).  Judge Kendall then asked the parties for comment on his proposed course of action.  Ludlum conceded that the court was correct regarding the effect of Leatherman upon the case but stated that he had an ethical obligation to inform Archer County that it was now potentially liable for a damage judgment.  Ludlum further stated that the interests of the Sheriff individually and the County might conflict on the issue of Monell policy or custom.  Ludlum also stated on several times that he was representing the Sheriff only in an individual capacity.  Ludlum suggested that the court continue the case for a week to allow the County time to consider whether it wanted a separate attorney.

Judge Kendall responded by expressing a desire to begin testimony that morning. While agreeing that a conflict of interest was possible in this type of lawsuit, the court saw no possibility that such a conflict would arise because the defense's pretrial filings had announced an intention to defend on the grounds that the sexual intercourse between Bennett and Pippin had occurred outside the scope of Pippin's duties as Sheriff.  Finally, Judge Kendall concluded that Ludlum did represent both the Sheriff and

4

Archer County, highlighting that Ludlum & Ludlum had initially filed the 12(b)(6) motion on behalf of the Sheriff individually and in his official capacity.[1]

After this exchange, Judge Kendall made the following rulings from the bench. First, he stated that the plaintiff would begin her case that day. Second, he would grant a 30 minute recess to allow Ludlum to notify Archer County officials of the reinstatement of the lawsuit against the Sheriff in his official capacity. Third, the judge stated that, because this was a bench trial, he would continue the case, reopen discovery, and recall witnesses for later cross-examination, should the County wish to do so. The judge reemphasized that the trial was to the court, and that he could be flexible as a result, but that trial would begin that morning.

The district court then granted a recess.[2] When Ludlum returned from the recess, the trial commenced. Testimony from various witness established the following undisputed facts. Ms. Bennett shot her husband in the chest after a violent domestic dispute in which Mr. Bennett had ripped the phone out of the wall, assaulted Ms. Bennett, then pointed a gun at her. At the time, the Bennetts were renting a house in Archer County. Ms. Bennett drove

---

[1] The colloquy on this latter point was extended. Ludlum repeatedly stated that he represented only the Sheriff individually, and the district court repeatedly disagreed.

[2] At oral argument to this court, Archer County conceded that the County Judge and Attorney came to the courthouse and sat in the audience section of the courtroom to observe much of the trial, which took place on the afternoons of February 10 and 17.

her pickup truck to a nearby convenience store located across the county line in Wichita Falls and called the Wichita Falls authorities. The Wichita Falls authorities arrested and handcuffed Ms. Bennett at the store, impounded the pickup truck, and notified the Archer County Sheriff's Office of the incident. Sheriff Pippin radioed Wichita Falls and instructed them to hold Ms. Bennett until he arrived to take custody of her.

After retrieving Ms. Bennett from Wichita Falls, the Sheriff drove her back to the house. By this time, Archer County Deputy Sheriffs had arrived to secure the scene and to take Mr. Bennett to the hospital. After receiving a tour of the site from a Deputy, the Sheriff left to attend to a brush fire. A Deputy Sheriff drove Ms. Bennett to the Archer County Sheriff's Office, where she was fingerprinted, photographed, and given Miranda warnings. After Ms. Bennett described Mr. Bennett's assault and the subsequent shooting to the Deputy, she signed a statement. The Deputy asked Ms. Bennett not to leave the County without the authorization of the Sheriff's Office and drove her home. Ms. Bennett then left briefly in her husband's truck to find a phone to call a friend in Austin for consolation.

The Sheriff, in the meantime, attended to the brush fire, then traveled to the hospital and learned that Mr. Bennett would not be released from the hospital that evening. He returned to the Bennett household, found no one there, and sat on the porch until Ms. Bennett returned. The Sheriff testified that he had at least two reasons for returning to the house. The first was that he

6

wanted to assuage Ms. Bennett's previously expressed concern that Mr. Bennett's friends would attack her as a result of the shooting. The second was that he was mildly aroused by the manner in which Ms. Bennett had touched him as he lit a cigarette for her during the drive from Wichita Falls to her house. At the time of his return to the house, the Sheriff was wearing his badge and gun.

At this point, the testimony of Ms. Bennett and the Sheriff diverged. According to Ms. Bennett, when she returned to the house, the two sat on the porch drinking coffee while the Sheriff questioned her about the shooting incident. After a while, the Sheriff touched her on the leg in a way that made her feel uncomfortable. In response, Ms. Bennett stated that she was tired and that she wished to answer any more questions the next day. Ms. Bennett saw the Sheriff off the porch, then went upstairs to bed and fell asleep. She awoke to find the Sheriff standing naked over her and attempting to remove her clothes. When she protested, the Sheriff responded that he was the sheriff and could therefore do what he pleased. When she persisted in objecting, the Sheriff stated, "What are you complaining about? I could have thrown you in jail and sorted it out later." The Sheriff then raped Ms. Bennett. Afterwards, the Sheriff ordered her to take a shower and not to tell anyone of the incident.

According to the Sheriff, Ms. Bennett returned shortly after his arrival at the house, and the two sat on the porch discussing their backgrounds and the difficulties in both of their marriages. The shooting that had occurred a few hours earlier did not happen

7

to come up in conversation.  After a while, the Sheriff helped Ms. Bennett remove her boots.  The Sheriff then said, "Why don't we go get on the bed?"  After Ms. Bennett put up what the Sheriff in a grand jury proceeding called "token verbal resistance," the two went into the house and had sex.  At no point did the Sheriff threaten Ms. Bennett or otherwise coerce her.

Two days later, after receiving the Sheriff's permission to retrieve her pickup truck and to move her residence, Ms. Bennett left Archer County for Austin.  She was subsequently no-billed by an Archer County grand jury.  She reported the rape to the Austin authorities, and the Texas Rangers arrested the Sheriff.  An Archer County grand jury, nine members of which the Sheriff knew by name, subsequently no-billed the Sheriff.

At the close of the evidence, the district court ruled for the plaintiff from the bench and later filed written findings of fact and conclusions of law.  The court found that the Sheriff raped Ms. Bennett in the manner described in her testimony, and that in doing so the Sheriff deprived Ms. Bennett of her substantive due process right to bodily integrity.  It held that the rape was under color of state law and that, because the Sheriff was the final policy maker of Archer County under Pembaur v. City of Cincinnati, 475 U.S. 469, 481-82 (1986), the County was liable for the rape.  The court also found that the Sheriff's actions violated state tort law.  The court then awarded one million dollars in compensatory damages and an equal amount in punitive damages and held the County jointly and severally liable for the compensatory damages.  The

8

court also awarded attorneys' fees and prejudgment interest.

After the court issued its findings of fact and conclusions of law, Archer County moved to intervene and for a new trial. The Sheriff individually and in his official capacity also moved for a new trial. The court denied these motions.

In this appeal, Archer County argues that the district court's reinstatement of the official capacity suit on the morning of trial violated its due process rights to notice, opportunity to be heard, and legal representation. The County also argues that the reinstatement violated the County's right to a trial by jury, and that the district court abused its discretion in denying its motion to intervene. Next, the County contends that the district court erred in holding it liable under state tort law. Further, the County claims that the district court erroneously held that the Sheriff's actions were under color of state law and constituted the policy or custom of Archer County. Finally, the County contends that the original 12(b)(6) dismissal of the complaint as to the Sheriff in his official capacity was correct, and asks us to reverse the reinstatement order and render judgment in its favor.

In a separate brief, the Sheriff repeats many of the arguments that the County makes and essentially argues that the County has been treated unfairly. It also argues that the district court's finding that the Ms. Bennett did not consent to sex was clearly erroneous, that the district court erred in certain evidentiary rulings, that the Judge was biased, and that the award of attorneys' fees was too high.

9

We pause to dispel one source of confusion that persists in this litigation. Under Hafer v. Melo, 112 S. Ct. 358 (1991), Ms. Bennett's suit against the Sheriff in his official capacity is a suit against Archer County directly in everything but name. When a plaintiff sues a county or municipal official in her official capacity, the county or municipality is liable for the resulting judgment and, accordingly, may control the litigation on behalf of the officer in her official capacity. A suit against the Sheriff in his official capacity is a suit against the County. When Ms. Bennett sued the Sheriff in his individual and official capacity, she sued two defendants: the Sheriff and the County. As their briefs illustrate, the defendants have apparently considered this litigation as involving three parties: (1) the Sheriff individually; (2) the Sheriff in his official capacity; and (3) the County. The defendants have apparently equated the interests of the Sheriff individually with the interests of the Sheriff officially. Under Hafer, such is not the case. We will refer to Ms. Bennett's suit against the Sheriff in his official capacity as a suit against Archer County.

It follows that Archer County's contention that the district court erred in denying its post-trial motion to intervene is without merit. When the district court reinstated the suit against the Sheriff in his official capacity, the County again became a party to this lawsuit. At the risk of stating the obvious, one already a party to a lawsuit may not, at least it certainly need

not, intervene in the same lawsuit.  We affirm the district court's denial of the County's motion to intervene.


                              III

     The County contends that we should reverse and render judgment in its favor because the complaint failed to state sufficient facts to support a cause of action and because Ms. Bennett failed to prove at trial that the Sheriff's rape constituted the County's policy or custom under Monell v. New York City Department of Social Services, 436 U.S. 658, 694 (1978).  We find neither of the County's arguments persuasive.[3]

                               A

     The County argues that the complaint failed to allege facts sufficient to support a claim against it.  We refuse to reach this issue.

     The reinstatement order was functionally identical to a denial of a motion to dismiss, and this effective refusal to grant a 12(b)(6) dismissal was followed by a final judgment after a trial on the merits.  After a trial on the merits, the sufficiency of the allegations in the complaint is irrelevant.  A district court must deny a motion to dismiss under Rule 12(b)(6) unless the complaint fails to state any set of facts upon which relief could be granted. Conley v. Gibson, 355 U.S. 41, 45-47 (1957).  Rule 12(b)(6)

---

     [3]  We reach these arguments in spite of the fact that, as we will explain, we reverse the judgment against the County and remand for a new trial because the County has asked us to reverse and render judgment in its favor on these two grounds.

measures the sufficiency of the plaintiff's allegations. When the plaintiff has prevailed after a full trial on the merits, a district court's denial of a Rule 12(b)(6) dismissal becomes moot. The plaintiff has proved, not merely alleged, facts sufficient to support relief. Any pleading defect may be cured by a motion under Fed. R. Civ. P. 15(b), and the sufficiency of the plaintiff's evidence may be tested by an appeal on that issue.

At least seven circuits hold that "denial of summary judgment is not properly reviewable on an appeal from a final judgment entered after trial." Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1250 (10th Cir. 1992) (collecting cases), cert. denied, 113 S. Ct. 1417 (1993); accord, Chesapeake Paper Products Co. v. Stone & Webster Engineering Corp., 51 F.3d 1229, 1234-37 (4th Cir. 1995); Watson v. Amedco Steel, Inc., 29 F.3d 274, 277 (7th Cir. 1994). The arguments for not considering an appeal from a denial of a Rule 12(b)(6) dismissal after a trial on the merits are stronger than those for not considering a refusal to dismiss under Rule 56, given the ease with which a plaintiff may amend a complaint after judgment in order to conform to the evidence. See Fed. R. Civ. P. 15(b).[4]

B

_____

[4] There is dictum stating that appellate courts should hear such appeals in Wilson v. First Houston Investment Corp., 566 F.2d 1235, 1238 (5th Cir. 1978) (quoting Charles A. Wright et. al., Federal Practice & Procedure § 1476, at 560 (2d ed. 1990)), vacated, 444 U.S. 959 (1979). This dictum takes place in the discussion of the different question of whether filing an amended complaint after an initial Rule 12(b)(6) dismissal waives the right to appeal the dismissal after final judgment. We are not bound by this dictum and refuse to follow it in this case.

12

Citing <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 688-91 (1978), the County argues that the district court erroneously held it jointly and severally liable for Sheriff Pippin's rape because the Sheriff's actions did not constitute a policy of the County. The County contends that the Sheriff's actions could not be County policy because they violated well-established County policy.

Our cases make clear that under <u>Monell</u>, "a single decision may create municipal liability <u>if</u> that decision were made by a final policymaker responsible for that activity." <u>Brown v. Bryan County, Oklahoma</u>, 67 F.3d 1174, 1183 (5th Cir. 1995) (emphasis in original); <u>see also</u> <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 124-25 (1988); <u>Turner v. Upton County, Texas</u>, 915 F.2d 133, 136-37 (5th Cir. 1990), <u>cert. denied</u>, 498 U.S. 1069 (1991). When a final policy maker makes the relevant decision, and that decision is within the sphere of the policy maker's final authority, "the existence of a well-established, officially-adopted policy will not insulate the municipality from liability where a policymaker herself departs from these formal rules." <u>Gonzales v. Ysleta Independent School District</u>, 996 F.2d 745, 754 (5th Cir. 1993). State law determines whether a particular individual is a county or municipality final decision maker with respect to a certain sphere of activity. <u>Praprotnik</u>, 485 U.S. at 124; <u>Jett v. Dallas Independent School District</u>, 491 U.S. 701, 737 (1989); <u>Doe v. Rains County Independent School District</u>, 66 F.3d 1402, 1407 (5th Cir. 1995).

In this circuit, "[i]t has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement, not by virtue of the delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected." 915 F.2d 136 (citing and quoting from Familias Unidas v. Briscoe, 619 F.2d 391, 404 (5th Cir. 1980)).[5] The Turner court held a county liable for the actions of its sheriff in planting evidence and conspiring to force the plaintiff to plead guilty of the resulting charges, concluding that "[w]hen the official representing the ultimate repository of law enforcement power in the county makes a deliberate decision to abuse that power to the detriment of its citizens, county liability under section 1983 must attach, provided that the other prerequisites for finding liability under that section are satisfied." 915 F.2d at 138.

In this case, the Sheriff's actions were those of the County because his relationship with Bennett grew out of the attempted murder investigation and because, as we will explain, he used his authority over the investigation to coerce sex with her. The fact that rape is not a legitimate law enforcement goal does not prevent the Sheriff's act from falling within his law enforcement function. See Turner, 915 F.2d at 137-38 (holding a Texas county sheriff

---

[5] The Sheriff's role in the County makes irrelevant the County's argument that no County official other than the Sheriff knew of the Sheriff's intention to rape Bennett. Under the Archer County power structure, no one had state law authority to contest the Sheriff's use of his power to place himself in a position to rape Bennett.

liable for planting evidence, presumably not a legitimate law enforcement goal).

                                   IV

Certain of the County's other arguments are more persuasive. In particular, the County was denied its right to a jury trial, and we therefore reverse the judgment against it and remand for a new trial.

Under Fed. R. Civ. P. 54(b), the district court had the power to reconsider and reverse its prior 12(b)(6) dismissal of the claims against the Sheriff in his official capacity. Rule 54(b) provides that, in the absence of an express entry of judgment with regard to a dismissed party, a 12(b)(6) dismissal does not "terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." In this case, however, the precipitous manner in which the district court proceeded after its reversal denied the County its right to a jury trial.

The complaint included a demand for a jury trial. Under Fed. R. Civ. P. 38(d), the County could rely on that demand, and Ms. Bennett could not withdraw it without the consent of all parties subject to trial on the merits, including the County. See Pinemont Bank v. Belk, 722 F.2d 232, 235 (5th Cir. 1984). When the district court reinstated the County on the morning of trial, the County returned to the case with its right to a jury trial. The district

15

court, however, proceeded with a bench trial an hour after reinstating the County.

Ms. Bennett contends that the County waived its right to a jury trial first, by agreeing to an arbitration conditioned upon a waiver of a jury trial, and second, by proceeding with the bench trial. Regarding the second alleged waiver, Ms. Bennett points out that the County Judge and Prosecutor were spectators to the bench trial knowing that the district court thought that the County had consented to a bench trial with Ludlum & Ludlum as the County's attorney. Ms. Bennett relies on Casperone v. Landmark Oil & Gas Corp., 819 F.2d 112, 116 (5th Cir. 1987), in which we held that a party's participation in a bench trial without objection waived its previously established right to a jury trial.

We do not agree. In Casperone, the waiving party participated in the trial; in this case, the district court reinstated the County and proceeded to a bench trial one hour later, giving the County an insufficient opportunity to assert its rights. By the time the County Judge and Prosecutor arrived in the courtroom, trial to the court was well underway. Any attempt by the County to assert its right to a jury trial at that time would have been futile. The judge had already repeatedly stated that this was to be a bench trial and it was to start testimony that day. The judge's flexibility on issues of reopening discovery and recalling witnesses by necessity assumed that the trial would be to the court. The County did not waive its right to a jury trial by failing to make a futile motion.

16

Nor did the County participate in this trial via the representation of Ludlum & Ludlum. Ms. Bennett notes, correctly, that Fed. R. Civ. P. 54(b) provides that a party dismissed under Rule 12(b)(6) remains in the case until final resolution of all claims as to all parties, unless the district court expressly directs entry of judgment with regard to that party. Ms. Bennett interprets Rule 54(b) to mean that the County remained a party to this lawsuit throughout the entirety of the proceedings. She argues that Ludlum & Ludlum undertook to represent the County at the 12(b)(6) stage of the litigation, and that because the County remained a party, Ludlum & Ludlum continued to represent the County thereafter. Ms. Bennett points out that although Ludlum & Ludlum moved to withdraw from representation of the Sheriff individually, the firm never asked to withdraw from representing the County. Accordingly, when the district court reinstated the County as a party, Ludlum & Ludlum still represented the County. Ms. Bennett then asks us to treat attorney Ludlum's protestations that he represented the Sheriff only in his individual capacity as a motion to withdraw from representation, which, given the late date of the motion, the district court could deny. When attorney Ludlum and his associates proceeded to try the case, they did so on behalf of the County, placing this case on all fours with Casperone.

Our disagreement with Ms. Bennett begins with her construction of Rule 54(b). We agree with Ms. Bennett that Rule 54(b) kept the County in the lawsuit in the sense that Ms. Bennett could not appeal the dismissal at that time. But we disagree that the County

17

remained a "party" in the sense that it had to request admissions, ask and answer interrogatories, notice and attend depositions, file motions, and otherwise litigate the case, all against the possibility that it might be reinstated as a party and be required to go to trial that same morning. Such a construction of Rule 54(b), its plain awkwardness aside, would waste resources of the judiciary and the parties. A defendant is entitled to rely on a dismissal under Rule 12(b)(6) until notified otherwise, at which point it is entitled to a full and fair opportunity to assert the rights of a party.

Upon reinstatement, the court required attorney Ludlum to protect all of the County's interests, despite his repeated statements that he represented the Sheriff only in his individual capacity. We do not find persuasive the view of the district court and the plaintiff that Ludlum & Ludlum continued to represent the County on the morning of trial. The plaintiff's suggestion that we treat the district court's action in this case as a denial of the motion to withdraw rests upon the erroneous premise that Ludlum & Ludlum represented the County. On the morning of trial, attorney Ludlum made his position clear: he represented only the Sheriff in his individual capacity. If, as the trial court apparently thought, Ludlum & Ludlum should not have represented a different client in the same litigation without a full waiver of conflicts by all involved, the remedy was not to push ahead with the litigation by imposing a second client upon an unwilling law firm.

For identical reasons, we find unconvincing Ms. Bennett's

18

reliance on Rule 54(b) for the proposition that Ludlum & Ludlum continued to represent the County, even though the County had been dismissed from the case and even though the firm had since entered an appearance on behalf a different party in the same litigation. We find especially puzzling Ms. Bennett's reliance on the fact that Ludlum & Ludlum never moved to withdraw from representation of a party that had been dismissed from the lawsuit. We also attach little significance to the fact that Ludlum & Ludlum moved to reopen discovery on behalf of "Presley Pippin, Jr., Individually and as Sheriff of Archer County, Texas, in his Official Capacity." The fact of the matter is that the County was out of the lawsuit at this point, and this pleading did not purport to bring the County back in. The parties' conduct throughout this litigation suggests confusion on the status of the County and the Sheriff in his official capacity as a parties, with pleadings referring alternatively to "Presley Pippin," "Archer County Sheriff Presley Pippin," or the "defendant." We will not let this confusion cause us to lose sight of the fundamental fact that the County had been dismissed from the case.

For similar reasons, we find unpersuasive Ms. Bennett's argument that the County waived its right to a jury trial when the parties agreed to arbitrate the case pursuant to 28 U.S.C. §§ 651-58. Again, the County remained a party to the lawsuit only in the sense that the 12(b)(6) ruling in its favor lacked the finality of a judgment. But nothing in the record suggests that the County agreed to arbitrate the suit against it. The County could hardly

19

have been found to be jointly and severally liable for the arbitration award having been dismissed from the case. Plaintiff's counsel conceded at oral argument that the arbitration award ran only against the Sheriff individually. The County was not a party to the arbitration and accordingly was not a party to any waiver attending those proceedings.

We hold that the County did not waive its right to trial by jury. We reverse the judgment below against the County and remand for a new trial.[6]

V

The Sheriff individually argues that the district court erred in finding that he engaged in sexual intercourse with Ms. Bennett without her consent and that the rape was under color of state law. We do not agree.

We find no clear error in the district court's factual finding that the Sheriff raped Ms. Bennett. At bottom, this case turned on whether the district court believed Ms. Bennett or the Sheriff. The court believed Ms. Bennett, and that call belongs to the district court. We will not upset such a finding on appeal.[7]

---

[6] For the above reasons, we also reverse the district court's judgment holding the County vicariously liable under state tort law for the Sheriff's rape and remand for a new trial on this issue. We express no view at this time regarding whether the County may be held vicariously liable for the Sheriff's violation of state tort law. See Tex. Civ. Prac. & Rem. Code Ann. § 101.057(2) (Vernon 1986). We believe the district court should consider the County's arguments on this issue in the first instance.

[7] It is possible that the district court considered the following portions of the Sheriff's testimony in deciding whether

We also find no error in the district court's conclusion that the Sheriff acted under color of state law when he raped Ms. Bennett. The district court found that the Sheriff questioned Ms. Bennett about the earlier shooting for 30-45 minutes as the two sat on her porch, just before the rape occurred. The court also found that, in response to Ms. Bennett's refusals to have sex, the Sheriff said, "I can do what I want, I'm the Sheriff." The Sheriff himself testified that he used his authority as Sheriff to ascertain whether Mr. Bennett would be released from the hospital on the night of the rape. The plaintiff needed the Sheriff's permission to retrieve her pickup truck and to change her place of residence. Under such circumstances, we cannot argue with the district court's observation that "it was not lost on Gail Bennett (or the Sheriff) that the Sheriff carried the keys to the Archer County Jail with him in his pocket and wielded coercive power over

to believe the Sheriff's statement that Ms. Bennett consented to have sex:

> [Plaintiff's counsel]: But she said several things like no, didn't she?
> [The Sheriff]: She said one thing that was very coy.
> [The Court]: What do you mean by that?
> [The Sheriff]: Really not serious.
> [Plaintiff's counsel]: Well, what was it that she said?
> [The Sheriff]: "I don't know whether this is a good idea or not," just sort of a smile on her face.
> [Plaintiff's counsel]: You would refer to that, perhaps, as token verbal resistance?
> [The Sheriff]: Yeah, I suppose so.
>
> . . .
>
> [The Court]: So you understood a no not to really mean no?
> [The Sheriff]: Yes, sir.

21

Gail Bennett." The Sheriff's actions were an abuse of power held uniquely because of a state position, see United States v. Classic, 313 U.S. 299, 326 (1941), and the explicit invocation of governmental authority constituted a "real nexus" between the duties of Sheriff and the rape. Doe v. Taylor Independent School District, 15 F.3d 443, 452 n.4 (5th Cir.), cert. denied, 115 S. Ct. 70 (1994).

VI

Sheriff Pippin's other arguments are also without merit. The Sheriff complains that the district court erred on a series of evidentiary rulings. The Sheriff further contends that these errors, together with other comments from the bench, demonstrated that the trial judge was personally biased against the Sheriff. We review the district court's evidentiary rulings for abuse of discretion, and we will reverse on the basis of evidentiary errors only if they resulted in substantial prejudice to the Sheriff. Smith v. Wal-Mart Stores (No. 471), 891 F.2d 1177, 1180 (5th Cir. 1990). We find any error in the district court's evidentiary rulings harmless. Regarding improper bias, the Sheriff must show that "there are reasonable grounds for finding that the judge could not try the case fairly, either because of the appearance or the fact of bias or prejudice." United States v. Conforte, 624 F.2d 869, 881 (9th Cir.), cert. denied, 449 U.S. 1012 (1980). We find no hint of bias.

The Sheriff's first evidentiary complaint concerns the

22

testimony of Austin Police Department Sergeant Robert Merrill, the first law enforcement official to hear of the Sheriff's rape. Ms. Bennett's counsel asked why Merrill had traveled 300 miles to testify in this case, and the district court overruled the defense's relevance and opinion objection. Sergeant Merrill then stated, "I felt like [Bennett] had unconsensual sex either by force, threat, or intimidation, and I don't think this case was handled properly through the criminal courts." This statement did not substantially prejudice the Sheriff. The district court had already made clear that he would not consider Merrill's opinion of Bennett's credibility in making its own decisions on whom to believe, and the court's written memorandum does not rely upon it.

The Sheriff next objects to Bennett's testimony that she thought the Sheriff's questions to her on the porch shortly before the rape were normal law enforcement questions, on the ground that this testimony required expert knowledge. Bennett's state of mind at the time was relevant to the question of whether she later bowed to a show of authority or engaged in consensual sex. She was competent to testify to her own state of mind.

Third, the Sheriff objects that the district court allowed Bennett to compare her feelings in a bout of depression prior to the rape with those after the rape. The Sheriff argues that only an expert could give such testimony. The district court's memorandum did not mention this testimony, and any error in its admission was harmless.

Fourth, the Sheriff complains on relevance grounds that the

23

district court allowed plaintiff's counsel, during cross-examination of the Sheriff, to elicit testimony that some suspects in potential homicide investigations would have difficulty refusing the advances of the officer in charge of the investigation, and that such suspects might be intimidated by the power of a sheriff. This testimony was relevant to the issue of willful disregard of the plaintiff's rights, a question raised by the request for punitive damages.

Lastly, the Sheriff complains that the district court sua sponte prevented the defense from questioning Bennett about her post-rape sexual activity. The Sheriff contends that this element was relevant to show that Bennett suffered little psychological harm from the rape. Fed. R. Evid. 412(a)(2) excludes "in any civil . . . proceeding involving alleged sexual misconduct . . . [e]vidence offered to prove that any alleged victim engaged in other sexual behavior." The Sheriff contends that this evidence was admissible under the exception included in Rule 412(b)(2). Although the logic of this argument escapes us, we will not consider it, because the Sheriff admits that he did not lay the necessary predicate for this evidence by following the procedures outlined by Rule 412(c).

We also find unconvincing the Sheriff's argument that the district court's evidentiary rulings, comments from the bench, and questioning of witnesses demonstrated improper bias. The evidentiary rulings of which the Sheriff complains either were correct or constituted harmless error. The district court's

24

comments exhibited at most a sense of humor at a bench trial.[8] Regarding the questioning of witnesses, the court extensively questioned all of the witness at the end of cross-examination, and the court was evenhanded.

## VII

We REVERSE the judgment against the County entered by the district court and REMAND for a new trial. We AFFIRM the judgment against the Sheriff individually. The verdict and judgment against the Sheriff in his individual capacity determined no issue in the suit yet to be tried against the County.[9] Because we have not affirmed the judgment in its entirety, we REMAND the issue of attorneys' fees for resolution upon conclusion of the case in the district court.

Affirmed in part, reversed in part, and remanded.

---

[8] The district court stated that the docket was not a boring one, that the facts resembled those of a TV movie, and that despite his experiences watching goat ropings at a county fair he had never seen a fact situation resembling that in the case at bar.

[9] Evidence of the verdict or judgment should not be admissible at the new trial. We have, of course, rejected the County's attempt to prevail outright on the issues of Monell policy or custom and insufficiency of the allegations in the complaint.