114 F.3d 646
 Mary Amanda WEST, a minor child, By and Through her parent
and next friend, Rita NORRIS, Plaintiff-Appellant,
v.
James Bradley WAYMIRE, City of Frankton, and Frankton Police
Department, Defendants-Appellees.
 No. 96-3675.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 3, 1997.
Decided May 21, 1997.
 
 Thomas C. Doehrman, Conour & Doehrman, Indianapolis, IN, Thomas R. Ruge (argued), Brian A. Statz, Lewis & Kappes, Indianapolis, IN, for Plaintiff-Appellant.
 James B. Waymire, Westville, IN, pro se.
 Phillip A. Renz, Diana C. Bauer (argued), Larry L. Barnard, Miller, Carson, Boxberger & Murphy, Fort Wayne, IN, for Defendants-Appellees.
 Before POSNER, Chief Judge, and WOOD, Jr. and RIPPLE, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 This is a suit for damages under the Civil Rights Act of 1871, 42 U.S.C. § 1983, brought on behalf of a minor, Amanda West, against Brad Waymire, a former police officer of the Town of Frankton, Indiana, and against the Town itself. (The Town is erroneously called "City of Frankton" by the lawyers for both sides.) The naming of the Town's Police Department as a defendant adds nothing; it is almost certainly not a suable entity separate from the Town. See Dean v. Barber, 951 F.2d 1210, 1214-15 (11th Cir.1992); Ricketts v. City of Hartford, 74 F.3d 1397, 1400 n. 1 (2d Cir.1996); Martinez v. Winner, 771 F.2d 424, 444, modified on other grounds, 778 F.2d 553 (10th Cir.1985), vacated on other grounds under the name Tyus v. Martinez, 475 U.S. 1138, 106 S.Ct. 1787, 90 L.Ed.2d 333 (1986).
 
 
 2
 The suit alleges an infringement of rights protected by the due process clause of the Fourteenth Amendment, arising from the following facts. Between sometime in 1992 and September 1993, defendant Waymire (who was 28 years old at the beginning of the period, and married) engaged in sexual acts with plaintiff West, although she was only 13 at the beginning of the period. He was eventually convicted of child molesting on the basis of these acts and sentenced to prison for eight years. We may assume that Waymire was acting under color of state law and that the sexual acts that he perpetrated on West with or without her consent and that she claims caused her extreme and lasting humiliation and psychological injury deprived her of liberty within the meaning of the due process clause of the Fourteenth Amendment, Doe v. Taylor Independent School District, 15 F.3d 443, 450-52 (5th Cir.1994) (en banc); Scott v. Moore, 85 F.3d 230, 234-35 (5th Cir.1996); Abeyta v. Chama Valley Independent School District, 77 F.3d 1253, 1255 (10th Cir.1996); Stoneking v. Bradford Area School District, 882 F.2d 720, 727 (3d Cir.1989), and hence that she has a good claim under section 1983 against him. Waymire did not bother to appear in the suit, and the plaintiff obtained a default judgment against him, leaving the Town as the only defendant--and the district judge granted summary judgment for the Town on the ground that it was not liable for Waymire's acts. West's complaint included a supplemental state-law claim against the defendants, but the district judge relinquished jurisdiction over it, and West has since refiled it in an Indiana state court.
 
 
 3
 The case was not over in the district court. Damages remained to be assessed against Waymire on the default judgment. But the district court entered a final judgment under Fed.R.Civ.P. 54(b) in favor of the Town, and it is from that judgment that West appeals. Since West's federal claim against Waymire remained pending in the district court, the judge's action in relinquishing jurisdiction over the supplemental state-law claim was premature. But as the plaintiff is not complaining about the dismissal, we shall treat it as voluntary on her part and let it stand. The judge later entered judgment against Waymire for $600,000; we do not know how much if any of this judgment the plaintiff has been able to collect.
 
 
 4
 The facts, at least when viewed as favorably to the plaintiff as the record will permit, as we are obliged to do when summary judgment is granted for the defendant, reveal a pattern of official irresponsibility. Waymire was hired in 1991 to be only the third full-time police officer in the town (Frankton has a population of only 2,000), one of the other full-time officers being the chief of police, Calvin Pulley. Waymire was hired after a brief and superficial interview. He had no background as a police officer (though he had studied criminal justice in college); yet he was given only four weeks of police training, and it did not touch on the proper treatment of juveniles encountered in the course of a police officer's work; the Frankton police department had formulated no procedures for this delicate aspect of police work. Nor, after he was hired, did the department, which is to say the chief, supervise Waymire or the other line officer, David Huffman--with whom Waymire had from the start poor relations. Huffman seems not to have been a star police officer. A petition that he be fired garnered the signatures of 300 Frankton residents. The town board's response was to show the petition to Huffman so he'd know whose names were on it. He was, however, reprimanded for using baby talk in his log sheet ("I helped a little bitty baby rabbit because a big, bad, mean car ran over it").
 
 
 5
 Waymire correctly believed that being a Frankton police officer would provide him with opportunities for extramarital sex. He had heard that police officers had been known to engage in sexual intercourse in the Frankton police station and that a "first offense" of this kind, if detected, would result only in a reprimand. In March of 1992, responding to an emergency call from Huffman's girlfriend (now wife), whose home had been burglarized by a friend of Waymire's, Waymire told Mrs. Huffman (as she now is) that unless she performed fellatio on him he would report that she had fabricated the burglary. She didn't tell Huffman about this incident, but did tell him about a subsequent incident in which Waymire grabbed her buttocks and tried to kiss her. Although the Huffmans did not complain and there is no direct evidence that either incident involving Mrs. Huffman was known to Chief Pulley or the Town's board of supervisors, the plaintiff points out that not only is Frankton a very small town but Waymire is related to a number of its residents; indeed he testified in his deposition, we hope with some exaggeration (for otherwise Frankton has a severe problem of inbreeding), that he is related to a "majority" of the people of Frankton. In explanation of why she hadn't complained about Waymire, Mrs. Huffman testified in her deposition that Frankton is so small that "once one person knows, it seems like everybody knows, and that's not me. I like to keep to myself."
 
 
 6
 Another series of acts by Waymire before his molesting of Amanda West did give rise to a complaint. Evelyn Burger (Evelyn Harmon during the relevant period) was afraid of her ex-husband, who had just been released from prison. So she asked Waymire to escort her home, which he did--but as he left, he said, "Come here.... I'd like to kiss you.... Come on baby, I've got a hard on." She refused to let him kiss her. On another occasion Waymire was in the store where Burger worked. Her daughter, a 13 year old, was there too. Waymire remarked that "no 13 year old looks that good in a pair of jeans," and he asked the girl whether she'd "like to baby-sit my kids or me." Officer Huffman learned about these incidents and told Chief Pulley, who told Huffman to speak with Burger. He did so. Later, Pulley, Huffman, and another Waymire--Brad's cousin Myron, who happened to be the president of the town board and who had originally recommended that the police department hire Brad--interviewed Burger at her place of work. (Only minutes before, Brad Waymire had begged her not to complain about him.) The cousin thought her allegations no big deal. The chief decided to drop the investigation because Burger had not filed a written complaint--though she hadn't been told that a written complaint was necessary and had told the chief and his companions that she was scared to sign anything. She "didn't want to be bothered by cops," and believed that Brad's cousin, being on the town board, would protect him.
 
 
 7
 In March of 1993, about midway in Waymire's course of molesting Amanda, he had the effrontery to request an executive meeting of the town board to enable him to clear himself of allegations that he claimed were ruining his reputation. The reference was to the Burger incidents; and at the hearing he pointed out, apparently alluding to his remarks to her daughter, that it was rumored that he was "messing around with 13 year old girls." Huffman attended the meeting also. The Burger incidents were ventilated, but there was no reference to any misconduct with minors and the board members formed the impression that the root problem was bad blood between Waymire and Huffman and that the solution was for the two of them to work out their differences between themselves.
 
 
 8
 Here is how the molestation of Amanda West occurred. Frankton had a curfew, which Amanda, a disturbed child from a disordered home, regularly violated. Often when this happened Waymire would give her a ride home. Their conversations during these late-night rides soon took a sexual turn, and Waymire would sometimes fondle her breasts and buttocks. Once he took her to the police station on the pretext of giving her a breathalyzer test, and at the station forced her to undress and to perform fellatio on him. Eventually her mother discovered what was going on and reported it to Chief Pulley, who, this time not insisting on a written complaint, referred the matter to the county sheriff. The sheriff conducted an investigation that led to the successful prosecution of Waymire.
 
 
 9
 The record contains evidence of other sexual misconduct by Waymire, including exposing himself to a coworker of Burger's, although there is no evidence that the police chief or the town board knew about any of this other misconduct. Apart from the remarks about Burger's daughter and, of course, his conduct with Amanda, none of Waymire's sexual conduct or innuendoes involved, so far as anyone knows, minors.
 
 
 10
 Were this an ordinary tort case (as its state-court clone appears to be, cf. Tittle v. Mahan, 582 N.E.2d 796 (Ind.1991); Tom v. Voida, 654 N.E.2d 776, 786 (Ind.App.1995); City of Indianapolis v. Ervin, 405 N.E.2d 55, 60 (Ind.App.1980)) there would be little doubt about the liability of the Town of Frankton, as Waymire's employer, for the tortious acts that Waymire committed upon Amanda, assuming the plaintiff's version of the facts was confirmed at trial. It is true that the sexual misconduct of an employee, being intentional misconduct unrelated to any possible motive of furthering the employer's business, is not automatically imputed to the employer under the doctrine of respondeat superior even when it occurs at work during working hours. Konkle v. Henson, 672 N.E.2d 450, 456-57 (Ind.App.1996); Tomka v. Seiler Corp., 66 F.3d 1295, 1317-18 (2d Cir.1995); Andrade v. Mayfair Management, Inc., 88 F.3d 258, 261-62 (4th Cir.1996); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 70, pp. 505-06 (5th ed.1984). And in the analogous area of sexual harassment by one worker of another, challenged under Title VII of the Civil Rights Act of 1964, the plaintiff must, at least if the harasser is not a supervisory employee, show that the employer was negligent in failing to prevent the harassment. E.g., McKenzie v. Illinois Dept. of Transportation, 92 F.3d 473, 480 (7th Cir.1996); Baskerville v. Culligan International Co., 50 F.3d 428, 432 (7th Cir.1995); Splunge v. Shoney's, Inc., 97 F.3d 488, 490 (11th Cir.1996); Burns v. McGregor Electronic Industries, Inc., 989 F.2d 959, 966 (8th Cir.1993). But when the employee is a male police officer whose employer has invested him with intimidating authority to deal in private with troubled teenaged girls, his taking advantage of the opportunity that authority and proximity and privacy give him to extract sexual favors from these girls should be sufficiently within the orbit of his employer-conferred powers to bring the doctrine of respondeat superior into play, Mary M. v. City of Los Angeles, 54 Cal.3d 202, 285 Cal.Rptr. 99, 814 P.2d 1341, 1349-53 (1991); Primeaux v. United States, 102 F.3d 1458, 1463 (8th Cir.1996); Red Elk v. United States, 62 F.3d 1102, 1107 (8th Cir.1995), even though he is not acting to further the employer's goals but instead is on a frolic of his own. We want the police department to supervise its officers in this domain with especial care, and so we do not impose on the plaintiff the burden of establishing negligent supervision. The application of the doctrine of respondeat superior in these circumstances is nourished by the same considerations of policy that impose strict liability, or a nondelegable duty of care, on enterprises engaged in especially hazardous activities. The more hazardous the activity, the more we want the actor to investigate all feasible means of reducing the hazards, whether or not they are means encompassed by a judge's or jury's conception of due care. Indiana Harbor Belt R.R. v. American Cyanamid Co., 916 F.2d 1174, 1177 (7th Cir.1990); Anderson v. Marathon Petroleum Co., 801 F.2d 936, 939 (7th Cir.1986).
 
 
 11
 But the doctrine of respondeat superior is not available to a plaintiff in a section 1983 suit. E.g., Board of County Commissioners v. Brown, --- U.S. ----, ----, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). This would be of no importance in this case if such suits were otherwise governed by ordinary tort principles. For, as in the Title VII cases that we cited, an employer who fails to use due care to prevent its employees from committing tortious acts is liable for its negligence without regard to respondeat superior. American Dental Ass'n v. Martin, 984 F.2d 823, 828-29 (7th Cir.1993); Pomer v. Schoolman, 875 F.2d 1262, 1266 (7th Cir.1989); Keeton et al., supra, § 70, pp. 501-02. The facts that we have recited indicate that the Town of Frankton was negligent in its supervision of Waymire. The Town's tiny size is not an excuse, for it is nowhere graven that every village shall have its own police force even if the village is too small or too poor to conduct even a minimally professional police operation. In fact Frankton relies heavily on the county sheriff's department, as in the investigation of the complaint of child molestation lodged against Waymire. Even so, there is a question whether his molesting her was sufficiently foreseeable to make the Town liable. Webb v. Jarvis, 575 N.E.2d 992, 997 (Ind.1991); Bailor v. Salvation Army, 51 F.3d 678, 683 (7th Cir.1995) (applying Indiana law); Edwards v. Honeywell, Inc., 50 F.3d 484, 489 (7th Cir.1995) (same); Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (1928) (Cardozo, C.J.); 3 Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, The Law of Torts § 18.2 (2d ed.1986). It seems doubtful that the fact that police officers sometimes encounter teenage girls in the line of duty obligates a police department to take measures to prevent its officers from molesting these girls, on the theory that such molestation is so likely that it should be deemed foreseeable, that is, should actuate preventive measures. Chief Pulley should have taken Burger's complaint more seriously and should have dispelled any impression that the police department or the town board condoned the use of the police station for trysts. But the fact that a man is an adulterer does not give rise to an inference that he's also a child molester.
 
 
 12
 It is possible, though highly speculative, that had the Town taken effective measures against the risk that Waymire posed to adult women--the risk, known to the Town as a result of Burger's complaint, of low-level sexual harassment--an incidental consequence would have been to prevent or deter Waymire from molesting the plaintiff. Although that would make the Town's inaction a "but for" cause of the molestation, "but for" causation is not enough for legal liability. We know this from such tort classics as Gorris v. Scott, 9 L.R.-Ex. 125 (1874). The defendant's ship was supposed to be, but was not, equipped with pens to separate the animals carried on it, so that they wouldn't infect each other. The plaintiff's animals were washed overboard in a storm. Had the defendant complied with its statutory duty to install the pens, the animals would not have been lost. Nevertheless the defendant was not liable. The loss that occurred was not the loss that could have been foreseen as a consequence of the failure to take a disease-control measure. See also Edwards v. Honeywell, Inc., supra, 50 F.3d at 489-90; In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293, 1301 (7th Cir.1995); Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc., 61 F.3d 1250, 1258 (7th Cir.1995); Palsgraf v. Long Island R.R., supra.
 
 
 13
 Even if what Waymire did to Amanda would be deemed by an Indiana court to be a foreseeable, actionable consequence of the Town's negligent supervision of him, this would not carry the day for her. This is a suit under federal constitutional law rather than under the law of Indiana. We know from cases such as Martinez v. California, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980), that liability for constitutional torts is more limited in scope than common law tort liability. And, equally important, proof of the defendant's negligence is insufficient if the constitutional right that the plaintiff is trying to vindicate cannot be violated by merely negligent conduct, as is the case both generally and with specific reference to rights founded on the due process clause. See, e.g., Farmer v. Brennan, 511 U.S. 825, 835, 114 S.Ct. 1970, 1977-78, 128 L.Ed.2d 811 (1994); Personnel Administrator v. Feeney, 442 U.S. 256, 278-80, 99 S.Ct. 2282, 2295-97, 60 L.Ed.2d 870 (1979); Davidson v. Cannon, 474 U.S. 344, 348, 106 S.Ct. 668, 670-71, 88 L.Ed.2d 677 (1986); Daniels v. Williams, 474 U.S. 327, 333-34, 106 S.Ct. 662, 666-67, 88 L.Ed.2d 662 (1986). West cannot obtain a judgment against the Town of Frankton merely by showing that the Town was a negligent wrongdoer. The difficult question is what more than negligence must be shown. The answer varies by the nature of the constitutional right that the plaintiff is trying to enforce. When it is the right to the equal protection of the laws, the courts insist on a deliberate violation, that is, intentional discrimination. Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Dayton Board of Education v. Brinkman, 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977). Otherwise proof of disparate impact would establish a violation of the Constitution. Columbus Board of Education v. Penick, 443 U.S. 449, 464, 99 S.Ct. 2941, 2949-50, 61 L.Ed.2d 666 (1979); United States v. Washington, 109 F.3d 335, 338 (7th Cir.1997); Tucker v. United States Dept. of Commerce, 958 F.2d 1411, 1413-14 (7th Cir.1992). When it is the right not to be subjected to cruel and unusual punishments that is involved, the plaintiff must prove that the defendant, knowing that the plaintiff (or someone) was at serious risk of being harmed, decided not to do anything to prevent that harm from occurring even though he could easily have done so. This is the state of mind that goes by the name of "deliberate indifference," and it is the equivalent of criminal recklessness and suffices for liability under section 1983 for the infliction of cruel and unusual punishments. Farmer v. Brennan, supra, 511 U.S. at 836-37, 114 S.Ct. at 1978-79; Billman v. Indiana Dept. of Corrections, 56 F.3d 785, 788 (7th Cir.1995); Campbell v. Greer, 831 F.2d 700, 702-03 (7th Cir.1987).
 
 
 14
 The picture is less clear with regard to infringements of other constitutional rights and with regard to municipal liability for infringements of such rights generally. The case law in this circuit is divided. Some cases, illustrated by Archie v. City of Racine, 847 F.2d 1211, 1218-20 (7th Cir.1988) (en banc), and Hill v. Shobe, 93 F.3d 418, 421 and n. 1 (7th Cir.1996), deem criminal recklessness a sine qua non of liability in any section 1983 case. Others, despite the en banc decision in Archie, deem the civil standard of recklessness enough for liability under section 1983 in at least some cases. Estate of Porter v. Illinois, 36 F.3d 684, 688 (7th Cir.1994); see also Kulak v. City of New York, 88 F.3d 63, 75 (2d Cir.1996); Shaw v. Strackhouse, 920 F.2d 1135, 1144-46 (3d Cir.1990). The Supreme Court's most recent decision on municipal liability, Board of County Commissioners v. Brown, supra, suggests that the tort standard of recklessness is enough, --- U.S. at ---- - ----, 117 S.Ct. at 1391-92, as long as it isn't allowed to slide into gross negligence. Id. at ----, 117 S.Ct. at 1390 ("heightened negligence" not enough). The formula the Court used was conscious disregard of known or obvious dangers, id. at ----, 117 S.Ct. at 1391; see also Canton v. Harris, 489 U.S. 378, 390 n. 10, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989), and that is the language of tortious rather than criminal recklessness. Farmer v. Brennan, supra, 511 U.S. at 836, 840-41, 114 S.Ct. at 1980-81; Keeton et al., supra, § 34, pp. 213-14; cf. Shacket v. Philko Aviation, Inc., 841 F.2d 166, 171 (7th Cir.1988). Both Brown and Canton are subsequent to Archie, and invite reconsideration of the standard set forth in that case, though in the present case, as we shall see, the plaintiff loses under either standard.
 
 
 15
 Under either standard, the defendant must make a deliberate choice; an inadvertent omission won't do. Board of County Commissioners v. Brown, supra, --- U.S. at ----, ----, 117 S.Ct. at 1386, 1394; Canton v. Harris, supra, 489 U.S. at 389, 109 S.Ct. at 1205; Palmquist v. Selvik, 111 F.3d 1332, 1344, 1346 (7th Cir.1997); Triplett v. District of Columbia, 108 F.3d 1450, 1453 (D.C.Cir.1997). This explains the emphasis that the cases place on proof that the defendant, if a municipality, was acting (or not acting) pursuant to a policy or a custom, e.g., Monell v. Department of Social Services, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978); Lanigan v. Village of East Hazel Crest, 110 F.3d 467, 478-79 (7th Cir.1997); Starzenski v. City of Elkhart, 87 F.3d 872, 879 (7th Cir.1996), implying a deliberately chosen or adopted course of action. Pembaur v. City of Cincinnati, 475 U.S. 469, 477-79, 106 S.Ct. 1292, 1297-98, 89 L.Ed.2d 452 (1986). But Brown suggests as we have seen that a deliberate choice to avoid an obvious danger (or "plainly obvious," as the Court put it, no doubt for emphasis, 117 S. Ct. at 1392) is actionable under 42 U.S.C. § 1983 if the choice results in harm to a protected interest, even though the defendant obtusely lacks actual knowledge of the danger. Granted, there may be less here than meets the eye. The difference between a "plainly obvious" and an actually known danger--the critical difference between the criminal and tort standards of recklessness--may have little significance in practice, given the difficulty of peering into minds, especially when the "person" whose mind would have to be plumbed is an institution rather than an individual. See Palmquist v. Selvik, supra, 111 F.3d at 1346-47; Jackson v. Marion County, 66 F.3d 151, 152 (7th Cir.1995); Cornfield v. Consolidated High School District No. 230, 991 F.2d 1316, 1327 (7th Cir.1993); cf. Keeton et al., supra, § 34, p. 213.
 
 
 16
 The Town of Frankton, which is to say the members of the town government who make policy for it, Pembaur v. City of Cincinnati, supra, 475 U.S. at 481, 106 S.Ct. at 1299; Felton v. Board of Commissioners, 5 F.3d 198, 203 (7th Cir.1993); Bennett v. Pippin, 74 F.3d 578, 586 (5th Cir.1996), did not intend Waymire to molest Amanda. Nor is there any evidence that the Town knew Waymire was molesting Amanda. Or even that it knew there was a serious risk of this. But all this is just to say that there is no proof that the Town was criminally reckless in failing to protect her. We should also consider whether the risk to her was nevertheless obvious, which would be enough to cast liability onto the Town under the tort standard of recklessness, which may be the standard after Brown and Canton.
 
 
 17
 Slackness, laxness, cronyism, confusion, and dumbness there were in profusion; what is lacking is an obvious risk that Waymire was a child molester. All that was obvious was that he had commented to Burger about her 13 year old daughter's being sexy. Such a comment--in context a piece of sexual badinage with the mother--is not the equivalent of a threat to commit criminal acts upon that or any other 13 year old. Men are aware of pubescent girls, and vulgar men comment on or even to them. If the vulgar man then has sex with such a girl, someone who knew of the comment could not be thought to have overlooked an obvious danger to her. The Town's officials had in fact no reason to believe that Waymire was molesting or was going to molest any teenaged girl, and so the Town cannot be held liable under section 1983. The affidavit of the plaintiff's expert, a professor of criminal justice, while admissible to show that the Town had been negligent in its supervision of Waymire, was not admissible to show that this negligence constituted a municipal policy of refusing to protect teenage girls from the sexual depredations of the Town's police officers--a legal conclusion that an expert witness is not allowed to draw, Woods v. Lecureux, 110 F.3d 1215, 1219-21 (6th Cir.1997); Berry v. City of Detroit, 25 F.3d 1342, 1353-54 (6th Cir.1994); Salas v. Carpenter, 980 F.2d 299, 305 (5th Cir.1992); Stokes v. Bullins, 844 F.2d 269, 275 (5th Cir.1988), and an erroneous legal conclusion to boot, as well as (maybe because) one that exceeded the expert's professional competence, which was limited to describing sound professional standards and identifying departures from them. Haley v. Gross, 86 F.3d 630, 644-45 (7th Cir.1996); Salas v. Carpenter, supra, 980 F.2d at 304-05. There is little doubt that, as the expert opined, the Town of Frankton failed to exercise due care. But that cannot make it liable in a suit under 42 U.S.C. § 1983.
 
 
 18
 AFFIRMED.