ACCEPTED
01-15-00148-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
6/26/2015 2:26:32 PM
CHRISTOPHER PRINE
CLERK

No. 01-15-00148-CV

## IN THE FIRST COURT OF APPEALS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
6/26/2015 2:26:32 PM
CHRISTOPHER A. PRINE
Clerk

## HOUSTON, TEXAS

**CITY OF NASSAU BAY, TEXAS,**
*Appellant*

**v.**

**H. RAY BARRETT and 1438 KINGSTREE LANE,**
*Appellees*

Appeal from Cause No. 2013-10661, in the
152nd District Court of Harris County, Texas

## APPELLEES' BRIEF

**SIMPSON, P.C.**

Iain G. Simpson
State Bar No. 00791667
1333 Heights Boulevard, Suite 102
Houston, Texas 77008
(281) 989-0742
(281) 596-5960 (fax)
iain@simpsonpc.com

APPELLATE COUNSEL FOR
RAY BARRETT AND 1438 KINGSTREE LANE

**ORAL ARGUMENT CONDITIONALLY REQUESTED**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES..................................................................................v

STATEMENT OF THE CASE.......................................................... viii

STATEMENT REGARDING ORAL ARGUMENT.........................................ix

RESPONSIVE ISSUE PRESENTED ................................................................1

STATEMENT OF FACTS.................................................................................2

    *Factual Background* .............................................................................2

    *Procedural Background* .......................................................................10

SUMMARY OF THE ARGUMENT..................................................................10

ARGUMENT.....................................................................................................13

I.    **The Standard of Review**.......................................................................13

II.   **Argument on Responsive Issue One.** ...............................................15

    Barrett's claim is constitutional in nature, alleging a deprivation of protected property rights without due process. As such, administrative waiver—even if it occurred—does not bar his claim.

    A.    Barrett's claim is constitutional in nature and not subject to administrative waiver................................................16

    B.    The City labels as a non-conforming use a structure that was in place on Barrett's property for over 20 years before the City issued its stop-work order and for the construction of which Barrett received permission from the City official charged with giving

it. Is Barrett's use and enjoyment of his property a valuable property interest? ........................................................... 17

## III. Argument on Responsive Issue Two. ..................................................... 21

Barrett produced evidence that Boles's issuance of a stop-work order for work on his property was arbitrary and based upon no evidence, analysis, or guideline. Barrett also produced evidence that the Boles deliberately interfered with the presentation of his complaint to the City, depriving Barrett of the hearing he requested. Was Barrett denied due process?

A. The "50 percent" rule cited by Boles is not ascertainable by "general observation" and Boles is completely unqualified to make the appropriate determination. ............................................................. 21

B. Boles's issuance of the stop-work order was wholly arbitrary. ................................................................. 23

C. With no authority to do so, Boles changed the nature of Barrett's request to the Board. ............................. 25

D. Boles's and the City's actions denied Barrett due process. .................................................................. 26

## IV. Argument on Responsive Issue Three. ............................................... 27

The City argues that no policy of the City infringed on Barrett's property rights or caused him any damage. "Policy" is the act of a final policymaker, standing in for the City's governing body and acting within the scope of his duties. Boles—the sole City employee empowered to issue stop orders—did so. Was Boles's action the act of a final policymaker?

A. The Nature of Liability. ...................................................................28

B. The Definition of the Policymaker. ..............................................29

C. The City's Argument. ....................................................................31

D. Boles is a final policymaker within the relevant area. ..............31

CONCLUSION ..............................................................................................33

PRAYER .........................................................................................................43

CERTIFICATE OF COMPLIANCE ...........................................................35

CERTIFICATE OF SERVICE .......................................................................35

APPENDICES

MUNICIPAL CODE, CITY OF NASSAU BAY,
    Art. 10 – Nonconforming Uses .....................................................App. 1

# INDEX OF AUTHORITIES

## *Cases*

*Allen v. City of Baytown,*
No. 01-09-00914-CV, 2011 Tex. App. LEXIS 6894
(Tex. App.—Houston [1st. Dist.] Aug. 25, 2011, no pet.)........... 16, 20

*Bennett v. Pippin,*
74 F.3d 578 (5th Cir. 1996). ...................................................... 29, 30, 32

*Bowie Mem'l Hosp. v. Wright,*
79 S.W.3d 48 (Tex. 2002)....................................................................... 14

*Bowlby v. City of Aberdeen,*
681 F.3d 215 (5th Cir. 2012). ............................................................ 16, 20

*Brown v. Bryan County, Oklahoma,*
67 F.3d 1174 (5th cir. 1995). .................................................................. 30

*City of Chicago v. Morales,*
527 U.S. 41, 119 S. Ct. 1849 (1999). ...................................................... 21

*City of Waco v. Texland Corp.,*
446 S.W.2d 1 (Tex. 1969)................................................................... 18, 19

*Fuentes v. Shevin,*
407 U.S. 67, 92 S. Ct. 1983 (1972). ....................................................... 20

*Grayned v. City of Rockford,*
408 U.S. 104, 92 S. Ct. 2294 (1972). ...................................................... 21

*Lamar Corp. v. City of Longview,*
270 S.W.3d 609 (Tex. App.—Texarkana 2008, no pet.).................... 16

*Monell v. Dept. of Social Services,*
436 U.S. 658, 98 S. Ct. 2018 (1978). ...................................................... 28

*Olmstead v. U.S.,*
 277 U.S. 438, 48 S. Ct. 564 (1928). ....................................................... 15

*Pembaur v. City of Cincinnati,*
 475 U.S. 469, 106 S. Ct. 1292 (1986). .................................................... 32

*State of Texas v. Heal,*
 917 S.W.2d 6 (Tex. 1996)............................................................... 18, 19

*Texas Dep't of Parks & Wildlife v. Miranda,*
 133 S.W.3d 217 (Tex. 2004).............................................................13-14

*Westgate, Ltd. v. State,*
 843 S.W.2d 448 (Tex. 1992)................................................................ 18

*Zarnow v. City of Wichita Falls,*
 614 F.3d 161 (5th Cir. 2010)............................................................... 29

*Zinermon v. Burch,*
 494 U.S. 113, 110 S. Ct. 975 (1990). ................................................... 20

### Statutes

42 U.S.C. § 1983. ...........................................................................10, 16, 28, 29

TEX. LOC. GOV'T CODE § 211.011 ...........................................................15, 16

### Ordinances

MUNICIPAL CODE, CITY OF NASSAU BAY § 10-300 (1978). ................... 7, 22, 23

MUNICIPAL CODE, CITY OF NASSAU BAY § 17-102 (1972). ........................... 23

### Rules

TEX. R. APP. P. 9.4 ............................................................................. 35

TEX. R. APP. P. 33.1 ................................................................................3

TEX. R. APP. P. 38.2 ................................................................................1

### *Secondary Sources*

BLACK'S LAW DICTIONARY (5th Ed., abridged).............................................. 25

## STATEMENT OF THE CASE

### Nature of the Underlying Proceeding

The City of Nassau Bay (hereinafter, the "City") filed an enforcement action against Barrett and his residence, *in rem,* concerning certain zoning restrictions. Barrett counterclaimed based on an unconstitutional "taking" without due process.

### Subject of Relief

The case comes before the Court on appeal from the denial of the City's Plea to the Jurisdiction as to Barrett's counterclaim.

## STATEMENT REGARDING ORAL ARGUMENT

Barrett requests oral argument only conditionally. The answers to the questions raised by the City's interlocutory appeal are found in established Texas and federal jurisprudence. The appeal presents no novel question or issue. Barrett believes that oral argument is unlikely to further the Court's understanding in any meaningful way. Nevertheless, should the City be granted oral argument, Barrett requests equal time.

No. 01-15-00148-CV

# IN THE FIRST COURT OF APPEALS

## HOUSTON, TEXAS

---

## CITY OF NASSAU BAY, TEXAS,

*Appellant*

**v.**

## H. RAY BARRETT and 1438 KINGSTREE LANE,

*Appellees*

---

Appeal from Cause No. 2013-10661, in the
152nd District Court of Harris County, Texas

---

## APPELLEES' BRIEF

---

Pursuant to TEX. R. APP. P. 38.2, Appellees file this Appellees' Brief.

## RESPONSIVE ISSUES PRESENTED

Barrett's claim is constitutional in nature, alleging a deprivation of protected property rights without due process. As such, administrative waiver—even if it occurred—does not bar his claim.

Barrett produced evidence that Boles's issuance of a stop-work order for work on his property was arbitrary and based upon no evidence, analysis, or guideline. Barrett also produced

1

evidence that the Boles deliberately interfered with the presentation of his complaint to the City, depriving Barrett of the hearing he requested. Was Barrett denied due process?

The City argues that no policy of the City infringed on Barrett's property rights or caused him any damage. "Policy" is the act of a final policymaker, standing in for the City's governing body and acting within the scope of his duties. Boles—the sole City employee empowered to issue stop orders—did so. Was Boles's action the act of a final policymaker?

## STATEMENT OF FACTS

*Factual Background*

The case before the Court arises from conflict between an outspoken citizen and a city official. The stage on which it played out was a tangential use of City authority or lack thereof.

It is undisputed that Barrett purchased the property located at 1438 Kingstree Lane, Nassau Bay, in 1974 and has resided there ever since. It is also undisputed that Barrett has deep roots in the local community, having served on the City's Planning Commission and later as a member of the board of the NASA Area Management District. Barrett was, for many years, on friendly terms with both the Mayor and building official of the City. CR 484.

In 1983, following Hurricane Alicia's widespread destruction of the City, Barrett, assisted by a contractor, built a patio that included a hot tub

2

and fence onto the side of his house. CR 479-80. The patio was simply intended to replace a prior patio, there when Barrett purchased the property, made of wooden decking that included a trellis, beginning next to the house and extending to the fence. CR 481. The hurricane destroyed that trellis and the fence to which it reached. *Id.* When Barrett and his contractor commenced repairs following the hurricane, they replaced the trellis and the fence and installed a hot tub beneath a large holly tree. CR 483. The only difference between the old deck and trellis—what existed before the hurricane—and the new was the presence of the hot tub. CR 487.

The storm's damage affected the City's permitting processes. Due to the widespread destruction caused by Alicia, the City received a huge volume of applications for building permits. CR 607.[1] The sheer number of applications precluded the usual permitting process, and it became necessary to grant permits only for major situations or projects. *Id.* Smaller

---

[1] The cited page from the record is the Affidavit of Andy Straub, a retired building official of the City of Nassau Bay, who served during times relevant to this matter. In its brief, the City argues—and Barrett agrees—that, before the trial court, the City objected to the admissibility of Straub's affidavit as unsworn. *See City of Nassau Bay's Brief,* at 12, n. 8. Nevertheless, the City never obtained a ruling on its objection, and it is unclear from the record whether the trial court considered Mr. Straub's testimony or not. Regardless, the City has waived any complaint concerning the admissibility of Mr. Straub's testimony by failing to obtain a ruling on its objection. *See* TEX. R. APP. P. 33.1(a) (requiring that timely objection and a showing that the trial court ruled on the objection is a prerequisite to any appellate complaint).

3

projects received verbal permission or authorization. *Id.* Barrett's project fit into this category. *Id.*

In 1992, Barrett had additional work done on the patio area. Dissatisfied with the trellis, which allowed leaves and debris to fall into his hot tub, he extended the roof of his home over the hot tub to the fence line, replacing the 12-foot trellis with a 12-foot section of roofing having no holes in it. CR 488-89. However, the roof left one hole for the holly tree—the one growing next to the hot tub—to grow through. CR 490. Barrett's contractor also enclosed the area with cedar walls around the patio and a window. *Id.* The fence, itself formed two of the "walls" of the structure. CR 498. Barrett did not apply to the City for a permit for this work because he spoke to Mr. Straub, then serving as the City's building official. CR 491; 607. Mr. Straub reviewed the plans and gave Barrett approval to proceed with the project. CR 491-92; 607. Such verbal assurance is within the authority of a City building inspector, as confirmed by the City's own current building inspector, Larry Boles. CR 571. Mr. Boles observed in his testimony before the trial court that a building inspector can "go out and observe construction as it's ongoing and say 'that's fine and go forward.'" *Id.*

In approximately 2010, the holly tree next to Barrett's hot tub died, whether due to drought or old age. CR 494. With hurricane season coming again, Barrett decided to remove the tree. CR 494-95. While Barrett intended a certain refurbishment of the enclosed area, he intended no new construction at that time. CR 495-96. Nevertheless, removal of the dead tree required removal of two "less than 8-foot" sections of the fence/walls, and removal of approximately 8 feet of deck boards. CR 499-500. Barrett purchased new deck boards to replace the rotted old ones. CR 500. Part way through the replacement of boards, Mr. Boles stopped by the property and issued an order to cease work. CR 554.

Removal of a dead tree does not require a City permit. CR 548. Nor does the laying or repair of a side patio, whatever its composition, provided it stands less than 30-inches tall and, thus, does not require handrails. *Id.*[2] Replacing fence boards does not require a permit, either, though installing a new fence does. CR 549. According to Mr. Boles, replacing more than 20 boards on a fence constitutes replacement of the entire fence. *Id.* Nineteen boards on a fence is "maintenance"; 21 is "replacement." *Id.* This fine distinction, by Mr. Boles's own admission, is

---

[2]    Barrett's deck was 10-12 inches off the ground and did not require handrails. CR 557.

nowhere to be found in the City's building rules. *Id.* Nevertheless, it is the rule that Mr. Boles enforced, along with his continuing conviction that the structure was over 50 percent destroyed by the work being done.

Boles issued a "stop work" order on the grounds that Barrett required a permit for the work being done. CR 551. In particular, Boles based his decision on his opinion that the structure on Barrett's property was "more than 50-percent destroyed," thus rendering any repair or replacement effectively new construction, requiring a permit. CR 552. Boles never performed a survey of the property or took any measurements of either the overall structure or the removed portion, basing his decision strictly upon "general observation." CR 552, 556.

For his part, Barrett denied that any structure was 50 per cent or greater destroyed by the work being performed, and mathematics would appear to back him up. The entire enclosed deck structure was 12 feet by 20 feet. CR 505. The work being performed removed only an eight-foot section of non-supporting wall. *Id.* By the calculations of Barrett—a licensed professional engineer in the State of Texas—this constituted, at most, a 22 percent removal of the structure. CR 505-06.[3]

---

[3] In fact, both Boles and Barrett were mistaken. As will be discussed *infra,* the City ordinance that contains the "50 percent" rule bases its determination, not on the

Boles conceded that, in order for his "over 50 percent" determination to be correct, the deck had to be considered an "accessory structure" that was not part of the living space of the house, itself. CR 552. Thus, it allowed separate estimation, apart from the square footage of the main home. *Id.* This distinction, like Boles's 19-and-21-board distinction, is found nowhere in the City's building code. CR 552-53. He based his "common sense" determination on the fact that, though it shared a roofline with the rest of the house, the enclosed deck was not part of the living space. CR 553. There was no doorway between the house and the deck, and there was no air conditioning or other climate control inside the enclosed deck structure. *Id.* Asked in his deposition whether the building code made such a distinction, Boles did not know. *Id.*

Boles also noted that the structure's placement next to the fence violated the seven-foot setback requirement of the City's building code. CR 553. That setback requires that the house's roof be seven feet back from the property line.[4] CR 557. For purposes of the property line setback

_____

percentage of the structure that is destroyed but upon the percentage of the structure's *value* that is destroyed, as determined by the City's tax assessor. *See* MUNICIPAL CODE, CITY OF NASSAU BAY § 10-300. There is no indication in the record that Boles ever conducted any sort of valuation of the structure on Barrett's property, either as part of the Barrett's house or as a standalone structure.

[4]    An "accessory structure" need only have a three-foot setback. CR 557. Evidence

7

requirement, Boles considered Barrett's enclosed deck a part of his main home. *Id.* But, for purposes of calculating the amount of the structure that had been destroyed, Boles considered it an "accessory structure." *Id.* But for purposes of the setback, he considered it a part of the main house. *Id.* Boles defined the structure differently, based upon which particular code provision was to be enforced. *Id.* Nevertheless, the stop work order issued by Boles related only to the 50 percent destruction observation. CR 603.

In protest of the stop-work order, Barrett sought a hearing before the Zoning Board of Adjustment. CR 507. Barrett sought only a hearing to remove the stop-work order on his property. CR 528. But, when he arrived at his meeting with the Board, the discussion centered on a request for a variance that he had ostensibly requested. *Id.* The one who changed Barrett's request was Boles. CR 568. While Barrett argued that he did not need a variance, only a lifting of the stop-work order, Boles took it upon himself to change Barrett's request—and the presumptions that went along with it—into something entirely different. *Id.* Boles could cite nothing in the City's ordinances or codes giving him the right to change a citizen's application to the Board. CR 585. Indeed, he testified that nothing gave

---

in the record shows that Barrett and the City discussed a three-foot setback as a possible solution to their impasse. CR 576-77.

him such authority.  *Id.*  Boles never consulted or contacted Barrett before changing the substance of his application to the Board.  *Id.*  Boles could not recall taking such action on any other application.  CR 586. Ultimately, the Board denied Barrett a variance.

In testimony before the trial court, Boles acknowledged that Barrett's enclosed deck has existed for at least twenty years, all the while posing no danger.  CR 574.  Boles agreed  that  if the  structure was only 40  percent destroyed,  there  would  be  no enforcement action for the City to bring; it could not meet the requirements to  remove  the  structure as  a  non-conforming one.  CR 576.  The same  would  be  true  if the  destruction were only 22  percent, and  Barrett  would  never  have had  to go before the  Board.  CR 576.

In a  second hearing, convened at the recommendation of the City attorney, the Board discussed with Barrett a three-foot setback for his enclosed deck.  CR 576-77.  Nevertheless, Boles takes the position that the Board could not authorize such a setback because the enclosed deck was not an "accessory structure."  CR 577.  Except when it was.  CR 552.  Boles never lifted his stop order, and the City manager, Mary Chambers, testified that no one has the authority to lift a stop-work order.  CR 595.  To this day, the work on Barrett's property remains unfinished.

9

*Procedural Background*

The City of Nassau Bay brought suit against Barrett and his property *in rem*, seeking injunctive relief and civil penalties. CR 4-7. Barrett made an appearance and asserted a counterclaim pursuant to 42 U.S.C. § 1983, asserting constitutional violations, as well as claims against the City under Texas law and various third-party claims. CR 15-32. The trial court ultimately dismissed Barrett's claims under Texas law and his third-party claims. CR 33. This order did not affect Barrett's constitutionally based counterclaim against the City.

The City then moved for dismissal of Barrett's constitutional claims in a plea to the jurisdiction. CR 44. Barrett responded and produced evidence in support of is response. CR 431-616. The trial court denied the City's plea, and the City took this interlocutory appeal. CR 629, 634-35.

## SUMMARY OF THE ARGUMENT

The City's argument in the trial court, the testimony of its witnesses, and much of its argument before this Court is based upon an incorrect premise. It suffers from a foundational infirmity that renders everything built upon that foundation unstable. The City first assumes that the enclosed deck on Barrett's property is a non-conforming use of his land and then characterizes his complaint as an attack on the Zoning Board's

refusal to grant him a variance. But the City approaches the case from entirely the wrong place.

Barrett's use is not a non-conforming use. He has no need of a variance. He never appealed the Zoning Board's decision because the Board never even considered the right question. Barrett received permission from the City's own building official when he and his contractor first did the work that the City now decries as a public hazard some 20 years before the City ever undertook enforcement action. Barrett had the assurance of the City official charged with enforcement of City building codes that his property use was a permissible one. Indeed, that official testified as much before the trial court.

As such, the question is not whether Barrett required a variance, but whether Boles's stop-work order was rationally based on the law and whether Barrett received appropriate opportunity to be heard on this infringement of his private property rights. The evidence, in the form of Boles's own statements, shows that Boles acted arbitrarily in issuing his stop-work order in the first place, making broad "general observations" based on no concrete measurements, at all, and incorrect criteria, despite the specificity of the code he claimed to be enforcing. In addition, the code provision Boles claimed to be enforcing was based upon valuation by the

Nassau Bay tax assessor—though it was less than clear from his deposition testimony that Boles even realizes this. At any rate, he is neither the tax assessor nor an appraiser of any sort.

Moreover, it shows that Boles was entirely willing to re-define the nature of Barrett's property in order to find a violation—categorizing it as an "accessory structure" for purposes of finding one violation and as a part of the main building for purposes of finding a separate one. There would be a violation in some way. Boles would see to that.

The final question is whether the City allowed Barrett a fair hearing on his complaint. Once again, Boles stepped in to reformulate Barrett's complaint into something more to his own liking. He unilaterally changed—with, by his own admission, no authority to do so—Barrett's complaint concerning Boles's stop-work order into a request for a variance, thus reversing the presumptions inherent to such a proceeding. A variance assumes that a property owner is at odds with the existing plan and needs permission to avoid it. Barrett presented evidence showing that he had no need of additional permission beyond what he already had.

The common thread is Boles, a final policymaker for the City. Boles played fast and loose with his evaluation of the work done on Barrett's property, defined the same portions of the property differently for

purposes of different enforcement provisions, and then took the extraordinary measure of changing Barrett's application to better reflect Boles's understanding of his complaint, in the name of providing "better service" to a citizen.

## ARGUMENT

### I.     The Standard of Review

A plea to the jurisdiction seeks to dismiss a case for want of jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226-27 (Tex. 2004). When reviewing jurisdiction, courts must first examine the pleadings, liberally construing those pleadings in favor of jurisdiction and always looking to the pleader's intent. *Id.,* at 226. The allegations found in the pleadings may either affirmatively demonstrate or negate the trial court's jurisdiction. *Id.,* at 226-22. If the pleadings do neither, this raises an issue of pleading sufficiency and the plaintiff must have an opportunity to amend the pleadings. *Id.* When a plea to the jurisdiction challenges the existence of jurisdictional facts, trial courts may consider relevant evidence submitted by the parties to resolve the jurisdictional issues raised, even where those facts may implicate the merits of the cause of action. *Id.,* at 227. If that evidence creates a fact issue as to the jurisdictional issue, then it is

for the fact-finder to decide. *Id.,* at 227-28.  Only if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, can the trial court rule on the jurisdictional issue as a matter of law.  *Id.,* at 228. In considering the evidence submitted by the parties, the trial court is required to take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor.  *Id.*

A trial court has no discretion in determining what the law is or in applying the law to the facts. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002).  Thus, an improper determination of the law or an incorrect application of it to the facts is *per se* arbitrary or unreasonable and an abuse of discretion.  *Id.*  But where, as in the case at bar, the facts are disputed, the trial court holds broad discretion.  The City sought no clarification from the trial court as to the basis for its denial of the City's plea.  Consequently, any ground, whether based in law or in fact, that will support the trial court's decision obligates this Court to affirm that decision.

## II. Argument on Responsive Issue One:

Barrett's claim is constitutional in nature, alleging a deprivation of protected property rights without due process. As such, administrative waiver—even if it occurred—does not bar his claim.

The City first argues that Barrett is barred from pursuing his counterclaim against the City because he failed timely to appeal the decision of the City's Zoning Board of Adjustment in accordance with Tex. Loc. Gov't Code § 211.011(b). Chapter 211 of the Local Government Code delineates, generally, the extent of Municipal Zoning Authorities. It has little to say regarding the activities of building officials like Boles.

Tex. Loc. Gov't Code § 211.011 provides for judicial review of the decision of a zoning board and requires that any petition to a district our county court requesting such review be presented within 10 days after the date the decision is filed in the board's office. Tex. Loc. Gov't Code § 211.011(b). But, in making its argument, the City once again characterizes Barrett's claim as a request for permission to build, rather than simply an exercise of his "right to be let alone." *See Olmstead v. U.S.*, 277 U.S. 438, 478, 48 S. Ct. 564 (1928).

15

**A.** **Barrett's claim is constitutional in nature and not subject to administrative waiver.**

Barrett's counterclaim against the City is based upon constitutional right and federal law, specifically 42 U.S.C. § 1983. CR 15-32. Barrett obtained the permission of the City's then building official—Mr. Straub—when he first enclosed the deck area adjacent to his home. CR 607. There, it remained for over 20 years before the City's current enforcement action was commenced.

Where a constitutional taking issue is brought, it can be considered even though other claims are dismissed for failure to exhaust administrative remedies under § 211.011, TEX. LOC. GOV'T CODE. *Lamar Corp. v. City of Longview,* 270 S.W.3d 609, 614-15 (Tex. App.—Texarkana 2008, no pet.). The exhaustion of administrative remedies is not necessary for a claim for the violation of a constitutional or federal statutory right. *Allen v. City of Baytown,* No. 01-09-00914-CV, 2011 Tex. App. LEXIS 6894 (Tex. App.—Houston [1st Dist.] Aug. 25, 2011, no pet.) (mem. op.). *See also Bowlby v. City of Aberdeen,* 681 F.3d 215, 222 (5th Cir. 2012) ("[E]xhaustion of state remedies is not required before a plaintiff can bring suit under § 1983 for denial of due process.").

**B.** **The City labels as a non-conforming use a structure that was in place on Barrett's property for over 20 years before the City issued its stop-work order and for the construction of which Barrett received permission from the City official charged with giving it. Is Barrett's use and enjoyment of his property a valuable property interest?**

Barrett first built the existing deck—extending to the fence line—and installed a hot tub in 1983, following Hurricane Alicia. CR 479-80. He enclosed his deck and hot tub in 1992. CR 488-89. At that time, he consulted Mr. Straub—the City's building official—who gave his blessing to the work. CR 607. Barrett has put the property to this use ever since. The City now argues that his doing so is illegal.

The City's argument is based, almost in its entirety, on the premise that the structure on Barrett's property was a non-conforming use and that, consequently, the City can effectively do no wrong in its enforcement action, the entire burden being upon Barrett to show his right to use his own property. But Mr. Straub's affidavit testifies both to the existence of a City policy allowing verbal permission for minor structures and projects, and his own participation—as the City's building official—in seeing to it that the structure complied with all codes and ordinances at the time it was built. CR 607. The affidavit created an issue of fact as to whether Barrett's

17

use of his property was, in fact, entirely proper, and it entirely undercuts the assumed premise on which the City's entire argument is based. It provided ample factual basis for the trial court to find that Barrett built with City permission. And, if Barrett's use was a permitted one, and Mr. Straub's affidavit says that it was, his use of his property was an exercise of his property rights, now denied by the City.

An effective "inverse" condemnation may occur when the government unreasonably interferes with the landowner's right to use and enjoy his property, such as by unreasonably restricting development. *Westgate, Ltd. v. State,* 843 S.W.2d 448, 452 (Tex. 1992). A direct, current restriction on present use will give rise to a claim for a taking. *Id.,* at 452-53.

In *State of Texas v. Heal,* 917 S.W.2d 6 (Tex. 1996), the Texas Supreme Court examined a constitutional "taking" claim based upon diminished access to property. In doing so, it examined its prior decision of *City of Waco v. Texland Corp.,* 446 S.W.2d 1 (Tex. 1969). *Texland* involved a company in the business of warehousing. 917 S.W.2d, at 10 (citing *Texland,* 446 S.W.2d, at 4). The company's warehouse was located beneath a recently constructed viaduct. *Id.* The viaduct was supported by piers located close

18

to the warehouse. *Id.* One pier was even located directly in front of the loading dock. Several witnesses testified that the location of the piers created a serious interference. *Id.* As the company was in the business of warehousing and transporting stored goods, which necessarily involved large commercial delivery trucks, these piers severely impeded the trucks' maneuverability with respect to backing up and parking. *Id.* The lack of maneuverability made the property virtually unusable for its intended purpose because trucks capable of transport could not access the premises. *Id.* The Texas Supreme Court found that the diminished use of the property added up to a constitutional taking because the land could no longer be used in the way that the property owner previously had. *Id.*

The lesson of *Texland* is succinct: traditional use counts. The way that a landowner has traditionally used his land matters to the question of a taking. Freedom of use is a property right. When government action impairs use and enjoyment of the property, a compensable "taking" has occurred. Unlike *Texland,* Barrett's counterclaim does not allege diminished access but actual direct restriction on his use of his own property, a use for which he had City permission and to which he has steadily and consistently put that property for over 20 years before Boles suddenly

found fault with it. Barrett's claim is rooted in constitutional grounds that need not be raised in an administrative appeal. *See Allen v. City of Baytown,* 2011 Tex. App. LEXIS 6894. The City's first issue should be overruled.

## III. Argument on Responsive Issue Two:

Barrett produced evidence that Boles's issuance of a stop-work order for work on his property was arbitrary and based upon no evidence, analysis, or guideline. Barrett also produced evidence that the Boles deliberately interfered with the presentation of his complaint to the City, depriving Barrett of the hearing he requested. Was Barrett denied due process?

In procedural due process claims the deprivation by government action of a constitutionally protected interest is not in itself unconstitutional. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S. Ct. 975 (1990). It is the deprivation without due process of law that creates th*e* violation. *Id.* Thus, even due process violations with minimal damages are constitutionally cognizable claims because the right to procedural due process is an absolute one, not dependent upon the merit of the substantive assertion. *Bowlby,* 681 F.3d, at 222. A procedural due process injury is complete at the time process is denied. *Id.* Consequently, no later hearing can undo the fact that an arbitrary taking that was subject to a right of procedural due process has already occurred. *Id.* (citing *Fuentes v. Shevin,*

20

407 U.S. 67, 82, 92 S. Ct. 1983 (1972).

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. *See City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S. Ct. 1849 (1999). Moreover, when law enforcement power is bestowed upon a government official, that power must be accompanied by minimal guidelines for its exercise. *Id.,* at 82. An ordinance that provides absolute discretion to an enforcing officer provides no notice to citizens as to what conduct or activity will violate that ordinance. Vague laws lead to arbitrary enforcement. *Grayned v. City of Rockford,* 408 U.S. 104, 108-09, 92 S. Ct. 2294 (1972). Whether or not the City's zoning ordinances are vague, the manner in which Boles undertook their enforcement was almost entirely arbitrary.

### A. The "50 percent" rule cited by Boles is not ascertainable by "general observation" and Boles is completely unqualified to make the appropriate determination.

Boles testified before the trial court that the structure on Barrett's property was more than 50 percent destroyed, in order to arrive at his decision that it could no longer be a protected non-conforming use. CR 552. Boles is not an appraiser. *Id.* He never performed any calculations concerning the area destroyed or its value. *Id.* Although the City failed to

include its current code in the record, that code does contain a "50 percent"

rule. *See* MUNICIPAL CODE, CITY OF NASSAU BAY § 10-300. The rule states:

> Should such [a nonconforming] structure or building be
> destroyed by any means to an extent of more than fifty (50) per
> cent ***of its assessed value at the time of destruction, as
> determined by the Nassau Bay tax assessor,*** it shall not be
> reconstructed except in conformity with the provisions of this
> ordinance.

MUNICIPAL CODE, CITY OF NASSAU BAY § 10-300(b). *See* App. 1. The "50

percent" rule is not based upon general observation or upon the amount of

the structure destroyed, except as it impacts the *value* of the overall

structure. Boles simply ignored this fact. Moreover, it is the value as

determined—not by an unqualified individual like Boles—but by the

Nassau Bay tax assessor that counts. App. 1. Boles not only used the

wrong criteria for his decision, he was not even remotely qualified to make

the decision in the first place, being neither the tax assessor nor any sort of

individual having a background in property valuation. Boles did not

simply miscalculate. He completely failed to apply any sort of relevant

measure to the question. The trial court could easily have found that

Boles's entire approach was so haphazard and off-the-mark that it

amounted to a complete failure of due process. There is no question that it

was wholly arbitrary.

## B.	Boles's issuance of the stop-work order was wholly arbitrary.

Boles issued a "stop work" order on the grounds that Barrett required a permit for the work being done. CR 551. In particular, Boles based his decision on his opinion that the structure on Barrett's property was "more than 50-percent destroyed." CR 552.[5] Even as he applied incorrect criteria, Boles applied that incorrect criteria sloppily and arbitrarily. He never performed a survey of the property or took any measurements of either the overall structure or the removed portion,

---

[5]	Even if the City claims that Boles operated under a different portion of the ordinance—a part that it actually included in the record—the provisions of the City's "Nonconforming Uses and Structures" subsection of the version of the zoning ordinance produced by the City says nothing about any "50 percent" rule. CR 192. It states only:

> If a structure occupied by a nonconforming use is destroyed by fire, the elements or other cause, reconstruction in accordance with applicable building ordinances will be permitted, but the nonconforming use cannot be expanded.

MUNICIPAL CODE, CITY OF NASSAU BAY § 17-102. CR 192. The ordinance allows the continuing existence of nonconforming uses in existence on the date on the effective date of the ordinance, June 14, 1971. CR 150, 192. The similar ordinance cited as MUNICIPAL CODE, CITY OF NASSAU BAY § 10-300 in argument under III.A., *supra,* appears to have superseded that cited by the City, having been adopted May 22, 1978. *See* https://www.municode.com/library/tx/nassau_bay/codes/code_of_ordinances?nodeId=COORNABATE

basing his decision strictly upon "general observation." CR 552, 556. As discussed previously, mathematics shows Boles's ballpark estimate to be far off the mark. The entire enclosed deck structure was 12 feet by 20 feet. CR 505. The work being performed removed only an eight-foot section of non-supporting wall and a portion of the decking, itself. *Id.*

Further, even if Boles's criteria and calculations had been correct, the manner in which he arrived at them was where the violation lay. By his own admission, Boles spent no more than 20 minutes at Barrett's property and took not one measurement before issuing a stop order that could not be lifted by anyone. CR 595.

Further, Boles's approach to enforcement reflected an overall "bait-and-switch" mentality, geared toward finding a reason to stop Barrett's work. Boles went so far as to classify the structure on Barrett's property differently for purposes of different enforcement provisions. For purposes of the property line setback requirement, Boles considered Barrett's enclosed deck a part of Barrett's main home. CR 557. But, for purposes of calculating the amount of the structure that had been destroyed for purposes of the unwritten "50 percent rule," Boles considered it an "accessory structure." *Id.* Had it been considered part of the entire house,

even Boles—and his "general observation—could see that the house was not 50 percent destroyed.  In short, Boles defined the structure differently, based upon which particular code provision he meant to enforce. *Id.*  There can be little clearer case of arbitrary enforcement.

**C.    With no authority to do so, Boles changed the nature of Barrett's request to the Board.**

The City argues in its briefing that Barrett has been afforded all the process that he is due, noting that he has had hearings before the City's Zoning Board and an opportunity to present evidence.  *See Appellant's Brief,* at 19.  But Barrett has never received the hearing that he requested.  Indeed, Boles saw to that by stepping in—with no authority, whatsoever—to change Barrett's hearing request from a simple request to have Boles's improper, arbitrary stop-work order lifted to a request for a variance.  CR 568.  Once again, Boles was a loose cannon, changing Barrett's hearing request to better support Boles's own actions.

The difference between the process Barrett requested and what he was afforded cannot be understated.  A "variance" is an authorization to a property owner to depart from the requirements of zoning regulations in using his property.  BLACK'S LAW DICTIONARY (5th Ed., abridged), at 805.

One who seeks a variance seeks permission, by definition. But Barrett's position, from the inception of this litigation, has been that he had permission from the City's own building officials. One of those officials confirmed both the City's policy of verbal issuance of permission for minor projects and his own participation and permission given to Barrett's project, in particular. CR 607. In short, Barrett did not need permission, but Boles's alteration of his hearing request attempted to force him to seek it.

## D. Boles's and the City's actions denied Barrett due process.

Boles was a highly placed City official at all relevant times. He was a policymaker, with authority to stop work on Barrett's property without review by any other individual or body. CR 576, 595. Boles played "fast and loose" with definitions under the City's ordinance, classifying Barrett's property as one sort of structure for purposes of one sort of enforcement action and as another sort of structure for purposes of a different sort. An enforcement that is entirely triggered by one individual's interpretation of the law—applying, piecemeal, different and conflicting sections as he sees fit—is the very definition of arbitrary enforcement. Whether or not the City's ordinance, itself, is facially vague, Boles's enforcement and

26

application of that ordinance certainly was.

In addition, Boles enforced a specific rule—the "50 percent" rule—in an entirely non-specific manner and without any information to justify that enforcement. Boles is not an appraiser. Boles is not the Nassau Bay tax assessor. The "50 percent" rule, articulated by § 10-300 of the City's municipal code requires a valuation by the City's tax assessor. Boles is neither qualified to give a valuation nor does he hold the office of tax assessor. Nevertheless, City policy put the power of a stop order entirely in his hands, to be exercised in as arbitrary a fashion as he chose to, and ultimately did, use it without regard to any applicable criteria. The City's second issue should be overruled.

## IV. Argument on Responsive Issue Three:

The City argues that no policy of the City infringed on Barrett's property rights or caused him any damage. "Policy" is the act of a final policymaker, standing in for the City's governing body and acting within the scope of his duties. Boles—the sole City employee empowered to issue stop orders—did so. Was Boles's action the act of a final policymaker?

With its third issue, the City argues that there is no evidence that any policy of the City was the cause of any violation of Barrett's federally

27

protected rights. It is wholly undisputed that Boles placed a stop-work order, preventing any further work on Barrett's private property.

### A. The Nature of Liability

Local government entities can be liable for actions of their employees that deprive another of a constitutional right only when that action amounts to an enforcement of official government policy. *See Monell v. Dept. of Social Services,* 436 U.S. 658, 690, 98 S. Ct. 2018, 2035-36, 56 L. Ed. 2d 611, 635 (1978). But a course of action may yet reflect informal "policy" despite a lack of formal adoption by the governing body. While "the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision[-]making channels." 436 U.S., at 690-91. The plain language of § 1983 itself

designates deprivation of rights through "custom" as an actionable constitutional tort.[6]

## B.    The Definition of the Policymaker

A policymaker is one who takes the place of the governing body in a designated area of administration. *Zarnow v. City of Wichita Falls,* 614 F.3d 161, 167 (5th Cir. 2010). State law determines whether a particular individual is a municipality's final decision maker with respect to a certain sphere of activity. *Bennett v. Pippin,* 74 F.3d 578, 586 (5th Cir. 1996). Generally, an official who has autonomy and authority to develop goals and the means for achieving those goals within a particular operating sphere can be a final policymaker for purposes of § 1983. 614 F.3d, at 167.

---

[6]    The statute states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

28 U.S.C. § 1983.

In this regard, even a single decision may constitute the making of policy if it is made by an official having final responsibility for the particular area of administration. 74 F.3d, at 586 (citing *Brown v. Bryan County, Oklahoma*, 67 F.3d 1174, 1183 (5th Cir. 1995).). It is the power structure and vesting the official with authority that is key.

Thus, in *Bennett*, a county sheriff who assaulted a plaintiff to whom he gained access by virtue of his position as the top law-enforcement official in Archer County was held to be a policymaker in that area, and his actions were attributed to the county. *Id.* Archer County raised the argument that a well-defined and well-established anti-harassment policy shielded it from any potential liability. *Id.* That is, it argued that its disagreement with what the policymaker did shielded it. But the Fifth Circuit disagreed. That the sheriff's actions may have violated express county policy was inapposite. "When a final policy maker makes the relevant decision, and when that decision is within the sphere of the policy maker's final authority, 'the existence of a well-established, officially-adopted policy will not insulate the [locality] from liability.'" *Id.*

## C.    The City's Argument

The City argues that the final policymaker in terms of zoning laws is the City Council. *Appellant's Brief,* at 25. But the City's argument is disingenuous. Indeed, it once again operates on the assumption that Barrett's complaint concerns a permitting problem, as a opposed to a stop-work problem. Barrett does not allege that the City's zoning ordinances deprived him of the established use of his land. He complains that Boles's haphazard, arbitrary, and capricious use of a stop-work order did. The final policymaker with regard to issuance of stop-work orders is Boles, himself.

## D.    Boles is a final policymaker within the relevant area.

As the County building official, Boles had the authority both to give verbal permission for the work on Barrett's home and to stop that work. CR 571. Boles testified to the trial court that a building inspector can "go out and observe construction as it's ongoing and say 'that's fine and go forward.'" *Id.* Ms. Chambers testified that no one has the authority to lift a stop-work order issued by Boles. CR 595.[7] Thus, as a City official having

---

[7]    Even Mr. Boles testified that he was powerless to lift his own stop order. CR 576. However, Boles's position suffers from the same logical infirmity that dogs every City witness's testimony and the City's argument before this Court—the assumption that

31

final authority over the issuance of stop-work orders, Boles qualifies as a final policymaker within the meaning of the law. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S. Ct. 1292 (1986) ("Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered."). Again, a single act—such as the issuance of a stop-work order—is an act of policy if it is taken by a final policymaker acting within the scope of his duties. *Bennett,* 74 F.3d, at 586. It is undisputed that Boles had the authority to issue the stop-work order he did. The City's own witnesses testify that order could not be reversed by anyone else. The stop-work order issued by Boles—the actual municipal act of which Barrett complains—*is,* therefore, municipal policy. It is a custom or usage of the City of Nassau Bay. It is a matter for which the City may be liable under 28 U.S.C. § 1983, and it waives the City's immunity. The City's third issue should be overruled.

---

Barrett's structure was a "non-conforming use," despite receiving the approval of the City official charged with building code enforcement and despite Barrett's being informed by that same official that there was no need for him to obtain a permit. CR 607. That he might have made a factual error seems never to have occurred to Boles, though it does appear to have occurred to the trial court.

**CONCLUSION**

There are many justifications upon which the trial court could have rested its Order denying the City's Plea to the Jurisdiction. The City chose not to seek clarification of the actual bases for the decision, requesting no findings of fact and no conclusions of law. But this much is clear. Boles exceeded his authority and his qualifications by arbitrarily stopping work on Barrett's property. Boles was neither qualified nor empowered to evaluate what constituted 50 percent of the value of the structure on Barrett's property, according to the City of Nassau Bay tax assessor—what the ordinance notes as the relevant criteria. What he did evaluate was, apparently, something entirely of his own invention—a "50 percent rule" contained nowhere in the ordinance he claimed to be enforcing. The trial court could very easily have found—based on the facts—that Boles's action was entirely arbitrary. The trial court could also have found that Boles's action in changing Barrett's application to the Board as greatly exceeding his authority and, in fact, depriving Barrett of the mastery of his own complaint.

Ultimately, Barrett simply relied upon the word of a City policymaker having authority over building within the City. Boles sought

33

to move the goalposts, according to his own imagining of the City's ordinance. The trial court did not abuse its discretion by recognizing the actions of a loose-cannon City employee for what they were. The trial court's Order denying the City of Nassau Bay's Plea to the Jurisdiction should be affirmed.

**PRAYER**

For the foregoing reasons, Appellees Ray Barrett and 1438 Kingstree Lane, *in rem*, respectfully request that the trial court's Order be affirmed.

Respectfully submitted,

**SIMPSON, P.C.**

*/s/ Iain G. Simpson*

_____

Iain G. Simpson
State Bar No. 00791667
1333 Heights Boulevard, Suite 102
Houston, Texas 77008
(281) 989-0742
(281) 596-6960 (fax)

APPELLATE COUNSEL FOR
RAY BARRETT AND 1438 KINGSTREE LANE

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Appellees' Brief is computer-generated, containing 8,056 words according to the word-count function of the application used to create it in the areas required to be counted by Rule 9.4, Texas Rules of Appellate Procedure, and complies with the Rule's word-count requirements. The Brief is printed in 14-point typeface, except for the footnotes, which are in 12-point typeface.

*/s/ Iain G. Simpson*

_____

Iain G. Simpson

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Appellees' Brief was served this 26th day of June, 2015, via facsimile, hand delivery, electronic service, or certified U.S. Mail, on the following:

William S. Helfand
bill.helfand@chamberlainlaw.com
Charles T. Jeremiah
charles.jeremiah@chamberlainlaw.com
1200 Smith Street, Suite 1400
Houston, Texas 77002

COUNSEL FOR CITY OF NASSAU BAY, TEXAS

*/s/ Iain G. Simpson*

_____

Iain G. Simpson

# APPENDIX 1

ARTICLE 10. - NONCONFORMING USES

10-100. - Nonconforming uses, lots, buildings, structures and nonconforming uses of buildings, structures, and premises.

*Scope.* It is the intent of this section to permit the continuation of those uses of land and structures and characteristics of use which were lawful before the passage of this ordinance, but which would be prohibited, regulated or restricted under the terms of this section or future amendments; to permit such nonconformities to continue until they are removed, but to discourage their survival; that nonconforming structures may be enlarged upon, expanded or extended, subject to the property development regulations of the district in which the structure is located, but that said structures may not be used as a basis for adding other structures or uses prohibited elsewhere in the same district.

10-200. - Nonconforming uses of land.

10-201. The lawful use of land existing at the time of the passage of this ordinance, although such use does not conform to the provisions hereof, may be continued, subject to the following provisions:

(a)  No such nonconforming use shall be enlarged or increased nor extended to occupy a greater area of land than was occupied at the effective date of adoption of this ordinance, unless such use is changed to a use permitted in the district in which such use is located.

(b)  No such nonconforming use shall be moved in whole or in part to any other portion of the lot or parcel occupied by such use at the effective date of adoption of this ordinance.

(c)  If any such nonconforming use of land ceases for any reason for a period of more than six (6) months, any subsequent use of such land shall conform to the regulations specified by this ordinance for the district in which such land is located.

(d)  No structure which does not conform to the requirements of this ordinance shall be erected in connection with such nonconforming use of land.

10-202. Community unit development specific use permits. Any and all community unit development specific use permits granted before the passage of this ordinance shall continue in full force and effect.

10-300. - Nonconforming buildings and structures.

The lawful existence of a structure or building at the effective date of adoption of this ordinance, although such structure or building does not conform to the property development regulations of this ordinance for minimum lot areas and dimensions, minimum yard setback requirements, maximum building height, total floor area, lot coverage and minimum floor area requirements, or other characteristics of the structure, or its location on the lot, may be continued so long as it remains otherwise lawful, subject to the following provisions:

(a)  Nonconforming buildings and structures may be enlarged upon, expanded or extended subject to all the property development regulations including minimum lot area and dimensions of the district in which the building or structure is located. No such building or structure shall be enlarged upon or altered in any way which increases its nonconformity. Such building or structure or portion thereof may be altered to decrease its nonconformity except as may be hereafter provided. Such nonconforming buildings or structures shall not be used as a basis for adding other structures or uses prohibited elsewhere in the same district.

(b)  Should such structure or building be destroyed by any means to an extent of more than fifty (50) per cent of its assessed value at the time of destruction, as determined by the Nassau Bay tax assessor, it shall not be reconstructed except in conformity with the provisions of this ordinance.

(c)  Reserved.

(d) Should such structure or building be moved for any reason for any distance whatever, it shall thereafter conform to the property development regulations for the district in which it is located after it is moved.

(Ord. No. 2009-648, § I, 6-6-09)

10-400. - Nonconforming uses of buildings, structures and premises.

If a lawful use involving individual structures, buildings, and/or premises in combination thereof exists at the effective date of adoption of or amendment to this ordinance that would not be allowed in the district in which it is located under the terms of this ordinance, the lawful use may be continued so long as it remains otherwise lawful, subject to the following provisions:

(a) No existing structure devoted to a use not permitted by this ordinance in the district in which it is located shall be enlarged, extended, constructed, reconstructed, moved, or structurally altered except in changing the use of the structure to a use permitted in the district in which it is located, except as may otherwise be provided herein.

(b) A nonconforming use may be extended throughout any part of a building or structure which is manifestly arranged as designed for such use at the time of adoption or amendment of this ordinance, but no such use shall be extended to occupy any land outside such building.

(c) Any structure or building, or structure or building and premises in combination, in or on which a nonconforming use is superseded by a permitted use, shall therefore conform to the regulations for the district in which such structure is located, and the nonconforming use may not thereafter be resumed.

(d) When a nonconforming use of a structure or building, or structure or building and premises in combination is discontinued or abandoned for six (6) consecutive months or for eighteen (18) months during any three-year period except when government action impedes access to the premises, the structure, or structure and premises in combination, shall not thereafter be used except in conformance with the regulation of the district in which it is located.

Where nonconforming use status applies to a structure and premises in combination, removal or destruction of the structure shall eliminate the nonconforming status of the land unless the land itself is in a nonconforming use. Destruction for the purpose of this section is defined as damage to an extent of more than fifty (50) per cent of the assessed value of the structure at the time of destruction.

10-500. - Alterations, construction, repairs and maintenance, and change.

(a) *Alterations.* A nonconforming building may be maintained and repairs and alterations may be made, except that in a building which is nonconforming as to use regulations, no structural alterations shall be made except those required by law. Repairs such as plumbing or the changing of partitions or other interior alterations are permitted.

(b) *Construction.* This ordinance shall not be deemed to require a change in the plans, construction, or designated use of any building on which actual construction was lawfully begun prior to the effective date of the passage of or amendment to this ordinance, and upon which actual built-construction has been diligently carried on. Actual construction is hereby defined to include the placing of construction materials in permanent position and fastened in a permanent manner. Where demolition or removal of an existing building has been substantially begun preparatory to rebuilding, such demolition or removal shall be deemed to be actual construction, provided that work shall be diligently carried on until completion of the building involved.

(c) *Normal repairs and maintenance.* On any building devoted in whole or in part to any nonconforming use, work may be done in any period of twelve (12) consecutive months on normal repairs, or on repairs or replacement of nonbearing walls, fixtures, wiring or plumbing to an extent not exceeding twenty (20) per cent of the current assessed value of the building, provided that the cubic volume of

the building as it existed at the time of passage of our amendment to this ordinance shall not be increased.